994 F.2d 609
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert P. AGUILAR, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee-Cross-Appellant,
v.
Robert P. AGUILAR, Defendant-Appellant-Cross-Appellee.
 Nos. 90-10597, 91-10024.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 12, 1991.
Decided May 12, 1993.
As Amended Aug. 9, 1993.
Rehearing En Banc Ordered
Sept. 2, 1993.
 
 Sara M. Lord, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee-cross-appellant.
 Robert D. Luskin, Jonathan A. Knee, and Catherine M. Cook, Law Office of Powell, Goldstein, Frazer & Murphy, Washington, DC, and Paul B. Meltzer and Peter A. Leeming, Law Office of Meltzer and Leeming, Santa Cruz, CA, for defendant-appellant-cross-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before: HUG, HALL and O'SCANNLAIN, Circuit Judges.
 ORDER
 On June 13, 1989, a federal grand jury returned an eight count indictment against United States District Judge Robert P. Aguilar. The indictment charged Judge Aguilar with conspiring to defraud the United States in violation of 18 U.S.C. § 371, disclosing the existence of a wiretap application in violation of 18 U.S.C. § 2232(c) (counts four and six), endeavoring to obstruct justice in violation of 18 U.S.C. § 1503 (counts seven and eight), and racketeering in violation of 18 U.S.C. § 1962(c). In August 1990, Judge Aguilar went to trial on five of the counts and, on August 22, a petit jury found him guilty on one count of illegally disclosing a wiretap in violation of 18 U.S.C. § 2232(c) (count six) and one count of endeavoring to obstruct a grand jury investigation in violation of 18 U.S.C. § 1503 (count eight). It acquitted Judge Aguilar on the other three counts. On November 1, 1990, the district court sentenced Judge Aguilar to two six month terms of imprisonment, to be served concurrently, and fined him $2,000. Aguilar appeals his conviction on both counts and the government appeals his sentence.
 The separate opinions of Judges Hug and O'Scannlain are filed contemporaneously with this order and opinion. The conviction for wiretap disclosure, count six of the indictment, is AFFIRMED for the reasons expressed in this opinion, as to which Judge O'Scannlain concurs in part. The conviction for obstruction of justice, count eight of the indictment, is REVERSED for the reasons expressed in the dissenting opinion of Judge Hug, as to which Judge O'Scannlain concurs in part. The sentence of six months' imprisonment and fine of $1,000 under count six is VACATED for the reasons expressed in the opinion of Judge O'Scannlain, as to which Judge Hug concurs in part, and REMANDED for reconsideration in light of United States v. Lira-Barraza, 941 F.2d 745 (9th Cir.1991) (en banc).OPINION
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 * BACKGROUND[1]
 
 
 2
 The chain of events leading to Judge Aguilar's indictment began with the 1980 conviction of Michael Rudy Tham for embezzling $2,000 from Local 856 of the Freight Checkers, Clerical Employees and Helpers Union, an affiliate of the International Brotherhood of Teamsters. Tham was Secretary-Treasurer of Local 856 and a member of several local and national Teamster committees. In July 1987, Tham filed a motion under 28 U.S.C. § 2255 to have his conviction set aside. In an effort to gain favorable treatment from District Judge Stanley Weigel, Tham sought the assistance of attorney Edward Solomon, an acquaintance of Judge Aguilar, and Abraham Chalupowitz, alias "Trigger Abe" Chapman, a putative mobster distantly related to Judge Aguilar by marriage. Chapman arranged a September 12, 1987, meeting between Solomon and Judge Aguilar to discuss Tham's case and how Judge Aguilar could assist Tham's petition. Over the next several months, Judge Aguilar discussed the case regularly with Chapman and Solomon, reporting to them his conversations with Judge Weigel about the matter.
 
 
 3
 Throughout this time, the San Francisco FBI was investigating local labor racketeering as part of a nationwide probe into health care provider fraud. Tham and Chapman were among the subjects of the investigation. On April 20, 1987, the FBI applied to then-Chief United States District Judge Robert Peckham for authorization to conduct electronic surveillance of Tham's business telephones and named Chapman as an interceptee of the wiretap. On May 20, the wiretap expired and, on July 15, Judge Peckham signed the first of a series of orders maintaining the secrecy of the wiretap while the investigation was ongoing. The last of the orders was signed on January 25, 1989.
 
 
 4
 As the investigation progressed, the FBI discovered that Chapman had a relationship with Judge Aguilar. On July 9, state agents observed Chapman leaving the Federal Building in San Jose with Judge Aguilar. The state agents informed the FBI and the FBI informed Judge Peckham. Judge Peckham expressed his concern, as well as his belief that Judge Aguilar must have been ignorant of Chapman's criminal activities.
 
 
 5
 A month later at an ABA reception in the Mark Hopkins Hotel in San Francisco, in an effort to warn Judge Aguilar about the character of the company he was keeping and help him avoid the appearance of impropriety, Judge Peckham mentioned to Judge Aguilar that Chapman's name had come up in connection with a wiretap application. He remarked that years earlier, as an Assistant United States Attorney, he had prosecuted Chapman on a drug charge and expressed his surprise that Chapman was still involved in criminal activity. Judge Aguilar indicated that he knew Chapman, but disclosed nothing else about their relationship.
 
 
 6
 Several months later, on February 6, 1988, Chapman paid a visit to Judge Aguilar at his home. As Chapman was leaving, Aguilar noticed that they were being observed from across the street by a man whom Judge Aguilar suspected was an FBI agent. Immediately Judge Aguilar telephoned his nephew Steve Aguilar, Chapman's grandson, and asked him to come to Aguilar's house. When Steve arrived, Judge Aguilar told him that an FBI agent was following Chapman and that he had heard "at work" that Chapman was being wiretapped. He instructed Steve to relay the information to Chapman, which he apparently did.
 
 
 7
 On April 26, 1988, a grand jury in the Northern District of California began to hear evidence regarding a conspiracy by Judge Aguilar, Tham, Chapman and Edward Solomon to influence the outcome of Tham's case. In May, Solomon agreed to cooperate with the FBI. On May 17, Solomon wore a wire to a luncheon meeting with Judge Aguilar. Over the course of their conversation, Judge Aguilar revealed that he had discussed the Tham matter with Judge Weigel and had warned Chapman about the wiretap. He also instructed Solomon to lie to the FBI about Aguilar's involvement in Tham's case. On May 26, Solomon recorded a second conversation in which he informed Aguilar that a grand jury was investigating their dealings in the Tham case. The two men also discussed how Solomon should lie to the grand jury in order to explain the records of Solomon's telephone calls to Judge Aguilar regarding the Tham matter.
 
 
 8
 Armed with this evidence, two FBI agents met with Judge Aguilar on June 22, 1988, and questioned him about his involvement in the Tham case. Before Judge Aguilar would respond to any questions, he wanted to know if he was a "target" of a grand jury investigation. Agent Carlon hesitated in answering the question, but when Aguilar said, "I assume from this that I very likely am [a target] if I've done anything wrong," Carlon responded affirmatively. Judge Aguilar then proceeded to lie to the agents about his relationship with Solomon, his involvement in the Tham case, and his knowledge of the wiretap. In response to Aguilar's further questions about whether or not he was a target, Carlon conceded that a grand jury was meeting, but would say nothing about the subject of the investigation or Aguilar's status. The interview continued and Aguilar lied further about his dealings with Chapman. At trial, Judge Aguilar testified that, by the end of the interview, he had concluded that his statements would be presented to the grand jury.
 
 
 9
 Based on this evidence, the jury convicted Judge Aguilar on one count of disclosing the existence of a wiretap in violation of 18 U.S.C. § 2232(c) and one count of endeavoring to obstruct a grand jury investigation in violation of 18 U.S.C. § 1503. Aguilar appeals each conviction on several grounds. He argues that the government's evidence was insufficient to prove that he satisfied the "knowledge" requirement of either section 2232(c) or section 1503; that the jury instructions misstated the "knowledge" elements of the statutes; and that the instructions impermissibly shifted to him the burden of proving that he lacked the knowledge required by these statutes. He also argues that the application of section 2232(c) to his disclosure of the wiretap violates his First Amendment right to free speech.
 
 
 10
 The government appeals Judge Aguilar's sentence, arguing that the district judge had no authority to depart downward six levels from the sentence level prescribed in the Sentencing Guidelines.
 
 II
 DISCLOSURE OF THE WIRETAP
 
 11
 The wiretap disclosure statute, 18 U.S.C. § 2232(c),[2] makes it a crime for any person with knowledge that a wiretap authorization has been applied for or granted to divulge that knowledge with the purpose of impeding the interception of communications. Accordingly, the trial court instructed the jury that the government was required to prove that "defendant had knowledge that authorizations to conduct electronic surveillance of Abe Chapman had been applied for." The court continued:
 
 
 12
 Knowledge of a fact, members of the jury, means that you're satisfied from the evidence that he knew it[.] Or knowledge of the existence of a particular circumstance may be satisfied by proof that the defendant was aware of a high probability of the existence of that circumstance[,] unless you find from the evidence that the defendant actually believed that the circumstance did not exist.
 
 
 13
 (emphasis added). Aguilar raises four challenges to his conviction under section 2232(c). He argues that: (1) the evidence was insufficient to demonstrate that he had "knowledge" that the FBI had applied to conduct a wiretap; (2) application of section 2232(c) to Aguilar's disclosure of the wiretap violated his First Amendment right to free speech; (3) the trial court's jury instruction on the "knowledge" requirement of section 2232(c) misstated the element; and (4) the "knowledge" instruction unconstitutionally shifted the burden of proof on "knowledge" onto Aguilar.
 
 A. Sufficiency of the Evidence
 
 14
 Aguilar argues that the evidence was insufficient to show that he had knowledge of a wiretap application. In reviewing the sufficiency of the evidence, this Court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
 
 
 15
 A defendant may not be convicted under section 2232(c) for disclosing a wiretap unless there is sufficient evidence to show that he knew that permission to conduct a wiretap had been applied for or granted. The evidence in this case was sufficient to convince a rational trier of fact that Judge Aguilar had such knowledge. The jury heard the tape of the May 17 conversation between Judge Aguilar and Edward Solomon, in which Judge Aguilar stated that he "knew they were wiretapping [Chapman]," and described learning about the wiretap from Judge Peckham. A criminal defendant's own statements about his knowledge are as strong evidence of that knowledge as a jury is ever likely to hear. This evidence was reinforced by Judge Peckham's testimony that he told Judge Aguilar about the wiretap application and Steven Aguilar's testimony that his uncle told him that he had learned at work that Chapman's telephone had been tapped.[3]
 
 
 16
 Aguilar argues that "the fact that both the application and the wiretap had long since expired when he first heard about the subject from Judge Peckham strongly suggests that he lacked the actual knowledge required by the statute." Aguilar's argument ignores the plain language of section 2232(c). The statute imposes liability on anyone "having knowledge that a Federal investigative or law enforcement officer has been authorized or has applied for authorization" to conduct a wiretap. 18 U.S.C. § 2232(c) (1988) (emphasis added). This language makes it unlawful to reveal a wiretap with the wrongful purpose required by section 2232(c) although the authorization is no longer current.
 
 
 17
 The dissent, agreeing with Aguilar, invites us to read "has been authorized" as "is currently authorized." Although we find the statutory language standing alone sufficiently clear to rule out this construction, we note that the legislative history accompanying the enactment of section (c) also refutes this interpretation: the report describing the newly-created offense stated that the statute prohibits "giving notice of the possible interception to any person who was or is the target of the interception." S.Rep. No. 541, 99th Cong., 1st Sess. 1, 34 (1986) (emphasis added), reprinted in 1986 U.S.C.C.A.N. 3555, 3588.
 
 
 18
 Congress has set a limit upon the time during which a wiretap may remain secret. See 18 U.S.C. § 2518(8)(d) (1988). It has also provided for extensions of that time upon a showing of good cause. See id. We are not here confronted with a prosecution for disclosure of a wiretap after the government had already served notice of the wiretap upon the interceptee, which might raise more troubling questions of the nature posed by the dissent. In this case, although the specific wiretap of which Judge Aguilar had learned expired on May 20, 1987, the district court ordered its secrecy maintained through January, 1989. Moreover, other wiretaps were authorized in the interim; wiretaps for which Chapman was an interceptee were in place from September 11 to October 12, 1987, and from October 21, 1987, through May 8, 1988. Thus, at the time Aguilar warned Chapman of the surveillance, it was still lawfully secret.
 
 
 19
 The dissent reads the statute to require that a defendant must intend to impede the specific unexpired wiretap of which he has knowledge before he can violate the law. See post at 628, 629. This construction permits the disclosure of any expired wiretap authorization, regardless whether the wiretap is still secret and regardless whether the disclosure may impede ongoing undercover investigations. To interpret section 2232(c) to permit disclosure by third parties while the government has obtained judicial approval to maintain secrecy would defeat the purpose of section 2518(8)(d). It is unlikely Congress intended to permit judicially-authorized surveillance efforts to be frustrated by such a narrow reading of the statute. As such a reading is incompatible with the statutory language, we reject it.
 
 
 20
 The dissent's emphasis on the existence of some interception with which disclosure of the particular wiretap could potentially interfere is unduly concerned with the possibility of actual interference. We think that the statute's primary concern is with the giving of notice with specific intent to interfere with surveillance. That such notice may not actually, nor even possibly, impede the particular surveillance episode of which Aguilar learned from Judge Peckham is less important.[4] Apart from the statutory language itself, this is evidenced by the fact that the statute also prohibits attempts to engage in such conduct.[5]
 
 
 21
 We hold that the fact that the wiretap authorization of which Aguilar learned from Judge Peckham had expired at the time Judge Aguilar disclosed its existence to Chapman does not render his "knowledge" insufficient to support a conviction under section 2232(c).
 
 B. Freedom of Speech
 
 22
 Aguilar also argues that section 2232(c), by punishing him for speaking about the wiretap, violates his First Amendment right to free speech. We review constitutional challenges to statutes de novo. United States v. Scampini, 911 F.2d 350, 351 (9th Cir.1990).
 
 
 23
 Aguilar does not dispute that if he had a duty to maintain the confidentiality of the wiretap application, he had no First Amendment right to disclose the application. See Snepp v. United States, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980) (per curiam). Rather, he argues that section 2232(c) violates his First Amendment rights because he had no such duty. He contends, therefore, that the district court erred by refusing to instruct the jury that " 'knowledge [for] the purposes of 2232(c) must come from confidential information, information derived from the judge[']s employment." Failure to give this instruction, he argues, deprived him "of the right to have the factual dispute about whether the disclosure involved a breach of duty resolved by the jury." Aguilar maintains that had the jury been given the opportunity to consider this question, it would have found that he had no duty. The government could not have demonstrated the confidentiality of the information Aguilar received from Judge Peckham because it could not "articulate any conceivable relationship between the disclosure by Judge Peckham and Judge Aguilar's official duties."
 
 
 24
 The problem with Aguilar's argument is that it posits limits on his responsibilities as a federal judge that do not exist. It simply does not matter that Judge Peckham informed him of the wiretap at a cocktail party rather than in chambers, or some other "official" setting. Judge Aguilar had a duty not to disclose the information because it came from Judge Peckham and related to official judicial business. The duty stemmed not from the place or time at which Judge Aguilar heard the information, but from the nature and source of the information.
 
 
 25
 In Snepp the Supreme Court considered whether a former CIA agent had a First Amendment right to publish a book on CIA activities in South Vietnam, based on information learned during the course of his employment. The Court found that an agreement Snepp had signed with the CIA prohibited him from publishing without CIA approval. But the Court noted that "apart from the plain language of the agreement, the nature of Snepp's duties and his conceded access to confidential sources and materials could establish a trust relationship." 444 U.S. at 511 n. 6, 100 S.Ct. at 766 n. 6. The same can be said of federal judges. Every day, we discuss confidential court business with our colleagues and our staff. It is well understood we are not free to discuss these matters with the attorneys that appear before us, with our families, or with our friends outside the court. Although it is difficult to find authorities discussing the existence of a duty on the part of federal judges to guard the confidentiality of their communications with their colleagues, that is undoubtedly because "its existence and validity has been so universally recognized. Its source is rooted in history and gains added force from the constitutional separation of powers of the three departments of government." Nixon v. Sirica, 487 F.2d 700, 740 (D.C.Cir.1973) (MacKinnon, J., dissenting) (discussing existence of a privilege protecting disclosure of communications among judges).
 
 
 26
 Our conclusion about the nature of the judicial duty of confidentiality is backed by recognition that were it not for the existence of such a duty, Judge Aguilar would never have learned of the wiretap. Judge Peckham testified that he believed Judge Aguilar would keep the matter confidential. Surely he felt free to relate information about a wiretap application to Judge Aguilar only because he regarded the conversation as confidential. Judge Aguilar's access to the information regarding the wiretap was a consequence of his judicial position and he therefore had a duty not to disclose the information.
 
 
 27
 Several years ago, a special federal appeals panel held that communications among judges "relating to official judicial business" are protected by a qualified privilege. See In re Certain Complaints Under Investigation by an Investigating Committee of the Judicial Council of the Eleventh Circuit, 783 F.2d 1488, 1520 (11th Cir.), cert. denied, 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). The court did not restrict the privilege to information a judge discloses to his staff or colleagues during the course of his official duties. It held that the privilege protected material "relating to official judicial business." We see no reason to circumscribe the corresponding official duty of confidentiality more narrowly.
 
 
 28
 If we were to accept Aguilar's logic, we would have to conclude that a judge never has a duty to keep confidential the information he or she learns from other judges in a social setting. There is a range of internal matters that judges and courts jealously guard from the public eye. Aguilar's "official duties" limitation on his duty of confidentiality would permit judges to freely disgorge these matters if they were to learn about them over lunch with a colleague, or at a cocktail party at another judge's home. The spectre of such disclosure alone is enough to stifle discussion among the members of the federal judiciary and undermine the integrity of the Article III branch.
 
 
 29
 Aguilar argues, however, that his acquittal on count four, which charged him with disclosing the wiretap in August 1987, after he spoke with Judge Peckham but before he saw the FBI agent observing Chapman, demonstrates that the jury concluded that he gained the requisite knowledge from his observation of the agent, not his conversation with Judge Peckham. He argues that even if he had a duty not to disclose what he learned from Judge Peckham, he had no such duty not to disclose what he learned from his own observation. We need not consider whether a federal judge's duty of confidentiality is limited in this manner, because there can be no doubt that Judge Aguilar's knowledge of the wiretap was based on what he learned from Judge Peckham. He himself said it.
 
 
 30
 Aguilar's nephew testified that when Aguilar informed him of the wiretap he said he had learned of the wiretap "at work." Indeed, the only sensible explanation for Judge Aguilar's knowledge is that when he saw the FBI agent trailing Chapman, he recalled his conversation with Judge Peckham and put two and two together; it is difficult to imagine how his observation of the FBI agent alone could have led him to conclude that Chapman's telephone had been tapped. If Judge Aguilar's knowledge were based even partially on what Judge Peckham told him, then he had a duty not to disclose it. The jury could have acquitted Judge Aguilar of count four for a number of reasons; there is no reason for us to conclude that it acquitted him because he lacked "knowledge." We decline Aguilar's invitation to draw conclusions about the jury's reasoning based on its decision to acquit him of count four.
 
 
 31
 Because Judge Aguilar had a duty not to disclose the wiretap, nothing in the First Amendment would prohibit the jury from applying section 2232(c) to his conduct.
 
 C. Misstatement of the Knowledge Element
 
 32
 Aguilar argues that the court's definition of knowledge as the awareness of a "high probability" of the existence of a fact was improper. He contends that this definition describes an objective state of mind akin to "negligence." The definition, he suggests, conflicts with the "basic and widely understood" principle that knowledge is a subjective state of mind requiring "actual awareness" of a fact. It is this "settled interpretation" of knowledge that Congress must have had in mind when it drafted section 2232(c), according to Aguilar. The definition used by the trial court, which Aguilar refers to alternatively as a "diluted" or "objective" standard of knowledge, is only appropriate when there is evidence that a defendant has consciously avoided learning an incriminating fact. If there is no such evidence, an instruction employing this definition creates the risk that the jury will convict the defendant for what he should have known, he argues. See United States v. Garzon, 688 F.2d 607, 609 (9th Cir.1982); United States v. Murrieta-Bejarano, 552 F.2d 1323, 1325 (9th Cir.1977). Because there was no evidence of "deliberate indifference" in this case, Aguilar maintains the government was required to prove that he possessed "actual knowledge." Whether a jury instruction misstates an element of an offense is a question of law that this court reviews de novo. United States v. Spillone, 879 F.2d 514, 525 (9th Cir.1989), cert. denied, 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990).
 
 
 33
 The Electronic Communications Privacy Act of 1986, Pub.L. No. 99-508, § 109, 100 Stat. 1858 (1986) ("the Act"), of which section 2232(c) is a part, is silent on the meaning of the statute's mens rea requirement. See 18 U.S.C. § 2510 (1988). Left without guidance from the statutory text, the trial judge turned to the legislative history and concluded that Congress had imported the Model Penal Code definition of "knowledge"[6] into the Act. Although the legislative history is of little help in discerning Congress's intent,[7] I conclude that the trial judge's definition was perfectly appropriate. The Model Penal Code view that one has knowledge of an attendant fact when one is "aware of a high probability of its existence" is as accurate a description of the subjective state of mind I call "knowledge" as any I can imagine.
 
 
 34
 I would reject the premise that Model Penal Code section 2.02(7) does not comport with traditional understandings of "knowledge." We have "actual" or "positive" knowledge of very few things we claim to "know." If we need a carton of milk, we go to the grocery store because we "know" there will be milk on the shelves. We slow down before we reach a yellow traffic light because we "know" that by the time we reach the light it will have turned red. Willie Sutton robbed banks because, to paraphrase the legendary thief, he "knew" the money was there. One could conceive of countless similar examples of facts we "know," not because we have actual knowledge of their correctness--knowledge that comes only when we arrive at the dairy section, when the light turns red, or when we enter the bank safe--but because we are "aware of a high probability" that the fact exists. And despite Aguilar's contentions, this state of mind differs from "actual knowledge" only in degree, not in kind. It is a subjective belief based on fact.
 
 
 35
 Courts have long recognized that "actual awareness" is only a subset of what we commonly think of as "knowledge." " 'Absolute knowledge can be had of very few things,' ... and the philosopher might add 'if any.' For most practical purposes 'knowledge' is not confined to what we have personally observed or to what we have evolved by our own cognitive faculties." Rollin M. Perkins & Ronald N. Boyce, Criminal Law 865 (3d ed. 1982) (quoting Story v. Buffum, 90 Mass. 35, 38 (1864) and State v. Ransberger, 106 Mo. 135, 17 S.W. 290, 292 (1891)). Indeed, courts have often employed a definition of "knowledge" less demanding than that of the Model Penal Code. Courts routinely hold that a defendant may satisfy the "knowledge" requirement for the crime of receipt of stolen goods if he merely has a "guilty belief" that the goods are stolen. See id. at 865-75.
 
 
 36
 Professor Perkins notes that the law will view the requirement of "knowledge" differently in different circumstances. He gives the example of a person who has been told that a certain bill of exchange is a forgery and believes the statement to be true. "Obviously [the person does not have 'knowledge' of the forgery] if the purpose of the inquiry is to determine whether he is qualified to take the witness stand and swear that the instrument is false; but if he passes the bill as genuine he will be uttering a forged instrument with 'knowledge' of the forgery if his belief is correct." Id. Likewise, it would make no sense for courts to require that violators of section 2232(c) have the same degree of knowledge that they would require of witnesses. Judge Aguilar would not be qualified to testify that a wiretap application had been submitted unless he had witnessed the application. But if that degree of "knowledge" was required for prosecution under section 2232(c), then only the FBI agent and United States Attorney who applied for the wiretap and the judge who granted it could be subject to prosecution, and that surely is not what Congress intended to be the coverage of the statute.
 
 
 37
 Despite all this, Aguilar argues that the drafters of the Model Penal Code conceived of section 2.02(7) not as a definition of knowledge, but as an exception to the traditional requirement of "actual" knowledge applicable only when there is evidence that a defendant has remained deliberately ignorant of a fact. He suggests that courts have ratified this limitation. Nothing in the text of section 2.02(7) even implies the limitation Aguilar proposes. Aguilar, however, fastens onto the commentary to section 2.02, which states that "[s]ubsection (7) deals with the situation that British commentators have denominated as 'willful blindness.' " Model Penal Code § 2.02 comment 9 (Proposed Official Draft 1962). A more thorough reading of the comment reveals that the drafters did not conceive of subsection (7) as an exception to the knowledge requirement applicable only when "willful blindness" is an issue, but rather as a comprehensive definition of knowledge designed to account for "willful blindness." "The inference of 'knowledge' of an existing fact is usually drawn from proof of notice of high probability of its existence, unless the defendant establishes an honest, contrary belief. Subsection (7) solidifies this usual result and clarifies the terms in which the issue is submitted to the jury." Id. (emphasis added). Read in its entirety, the meaning of comment 9 is clear: section 2.02(7) was designed to incorporate the concept of "willful blindness" into a general definition of knowledge that would limit the equation of "willful blindness" to "knowledge" to circumstances in which the defendant really did have knowledge. See Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 3.5(b), at 307-08 (1986) ("The Model Penal Code requirement of an awareness of a high probability of the existence of the fact serves to ensure that the purpose to avoid learning the truth is culpable.").
 
 
 38
 This circuit first adopted the Model Penal Code definition in United States v. Jewell, 532 F.2d 697 (9th Cir.) (en banc), cert. denied, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). There we recognized that section 2.02(7) purported to be a general definition of knowledge and we approved of it as such. "[I]n common understanding one 'knows' facts of which he is less than absolutely certain. To act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question." Id. at 700. Judge (now Justice) Kennedy, writing for the dissent, agreed that section 2.02(7) is "a definition of knowledge, not a substitute for it." Id. at 707 (Kennedy, J., dissenting); see also United States v. Yermian, 708 F.2d 365, 371-72 (9th Cir.1983) (recognizing the Model Penal Code definition as the " 'subjective standard of criminal knowledge required by this circuit"), rev'd on other grounds, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984); 2 Edward J. Devitt et al., Federal Jury Practice and Instructions § 54.15, at 923 (1990) (citing Jewell for proposition that in drug possession crimes, "[a] defendant does not have to act with positive knowledge in order to be culpable. It is sufficient if the defendant acts with an awareness of the high probability of the fact in question.").
 
 
 39
 The Supreme Court's approval of section 2.02(7) as a general definition of knowledge is clear from its use of the definition in cases in which "willful blindness" was not an issue. In Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Court considered the constitutionality of a presumption in 21 U.S.C. § 176a that evidence sufficient to show that a defendant possessed marijuana is also sufficient to show that the defendant knew the marijuana was illegally imported. The Court employed section 2.02(7) to interpret the meaning of "knowing" in the statute. See id. at 46 n. 93, 89 S.Ct. at 1553; see also Barnes v. United States, 412 U.S. 837, 845, 93 S.Ct. 2357, 2363, 37 L.Ed.2d 380 (1973) (considering constitutionality of inference of knowledge from possession of stolen goods and upholding defendant's conviction for possession of stolen Treasury checks on ground that the evidence could support finding that defendant "must have known or been aware of a high probability that the checks were stolen"); Turner v. United States, 396 U.S. 398, 416, 90 S.Ct. 642, 652, 24 L.Ed.2d 610 (1970) (relying on section 2.02(7) definition to interpret knowledge presumption in federal drug possession statute, 21 U.S.C. § 174); United States v. Hester, 880 F.2d 799, 803 n. 4 (4th Cir.1989) ("[T]he Court has indicated general acceptance of the proposition that awareness of 'a high probability' that a fact exists may properly be equated with 'knowledge' in the interpretation of criminal statutes.") (citing Leary, 395 U.S. at 46 n. 93, 89 S.Ct. at 1553 n. 93).
 
 
 40
 Aguilar nevertheless argues that if applied where there is no evidence of "willful blindness," the Model Penal Code definition by itself implies a duty on the part of a defendant to learn a fact and therefore creates the risk that the defendant will be convicted for what he should have known. Aguilar relies on a line of cases holding that because a "willful blindness" instruction--which includes but is not limited to the Model Penal Code definition--carries with it the risk that the jury will evaluate the defendant's behavior under a negligence standard and convict him for what he should have known, it should only be given in the rare case in which there is evidence that the defendant deliberately avoided learning the truth. See e.g., United States v. Sanchez-Robles, 927 F.2d 1070, 1073-75 (9th Cir.1991); Garzon, 688 F.2d at 609; Murrieta-Bejarano, 552 F.2d at 1325.
 
 
 41
 The risk identified by Murrieta-Bejarano and its progeny was never present in this case. That risk is created when an instruction that a defendant's conscious effort to avoid the truth is the equivalent of knowledge is given in a case where there is no evidence that the defendant did indeed consciously avoid learning the truth. In such a case, there is a risk that the jury will conclude that the defendant had some duty to inquire about the existence of the fact, if a reasonable person would have done so. See Garzon, 688 F.2d at 609. It is the instruction on conscious avoidance, not the Model Penal Code definition of knowledge which must accompany it, that implies the existence of a duty. In this case the district court did not instruct the jury on "conscious avoidance."
 
 
 42
 The Model Penal Code definition of knowledge standing alone implies no duty to discover facts. Contrary to Aguilar's argument, the definition describes a subjective state of mind, and therefore cannot subject a defendant to liability for negligence.[8] See Yermian, 708 F.2d at 372 (subsection (7) as the " 'subjective' standard of criminal knowledge required by this circuit"); Ira P. Robbins, The Ostrich Instruction: Deliberate Indifference as a Criminal Mens Rea, 81 J.Crim.L. & Criminology 191, 227 (1990) ("[T]he Model Penal Code formulation protect[s] the defendant from conviction for merely negligent behavior."). Indeed, the "balancing clause" of the definition, which instructs the jury that a defendant does not have knowledge if he "actually believes [the fact] does not exist," ensures that the defendant is not convicted for negligence. United States v. Esquer-Gamez, 550 F.2d 1231, 1235-36 (9th Cir.1977).
 
 
 43
 I would hold that the trial court did not err by instructing the jury that a person has knowledge if he is "aware of a high probability that a fact exists, unless he actually believes it does not exist." The definition describes a subjective state of mind and creates no risk that the defendant will be convicted for what he "should have known." Indeed it perfectly describes the state of mind that lay people typically regard as knowledge, that best fits the purpose of section 2232(c), and that this circuit and the Supreme Court have approved as a general definition of "knowledge." We conclude as well that the evidence of Judge Aguilar's "knowledge" was so substantial, that had the jury received no instruction, it would still have found that Judge Aguilar had knowledge of the wiretap.[9] We need not be concerned that the instruction might have allowed the jury to convict Aguilar "even if he was uncertain about whether there was a wiretap," as the dissent fears, since the evidence reflected no uncertainty: Judge Aguilar himself admitted in tape recorded conversations with Solomon that he "knew." If the instruction were error, it was harmless beyond a reasonable doubt in the face of Aguilar's admissions of knowledge.[10]D. Burden of Proof
 
 
 44
 Aguilar next argues that the jury instructions on knowledge unconstitutionally shifted the burden of proof onto him in violation of due process. Aguilar first raised his constitutional objection to the court's "knowledge" instruction in his motion for a new trial. When there is no objection to a jury instruction at trial, this Court reviews the instruction for plain error. United States v. Bustillo, 789 F.2d 1364, 1367 (9th Cir.1986). "A plain error is a highly prejudicial error affecting substantial rights." Id.
 
 
 45
 In Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court held that a jury instruction stating that " 'the law presumes that a person intends the ordinary consequences of his voluntary acts,' violates the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt." Id. at 512, 99 S.Ct. at 2453. A jury could interpret such an instruction as shifting the burden of proof to the defendant. Id. at 524, 99 S.Ct. at 2459.
 
 
 46
 Aguilar argues that the last clause of the trial court's instruction on "knowledge" had the same effect as the instruction in Sandstrom. The district court instructed the jury that
 
 
 47
 [k]nowledge of the evidence of a particular circumstance may be satisfied by proof that the defendant was aware of a high probability of the existence of that circumstance[,] unless you find from the evidence that the defendant actually believed that the circumstance did not exist.
 
 
 48
 (emphasis added).
 
 
 49
 In Esquer-Gamez, we held that the "balancing clause" of the Model Penal Code definition is necessary to protect the defendant against the risk that he will be convicted for what he "should have known." See 550 F.2d at 1235-36. In United States v. Hogg, 670 F.2d 1358 (4th Cir.1982), however, the Fourth Circuit held that a nearly identical instruction violated Sandstrom. That court concluded that a reasonable jury could interpret the instruction to mean that "once the government shows that the defendants knew [the circumstance] probably existed, the defendants must introduce more than some evidence that they had no actual knowledge to avoid a finding against them on this element." Id. at 1363-64. It held that Sandstrom "prohibits such a persuasion-shifting instruction." Id. at 1364.
 
 
 50
 I disagree that the reasoning of Sandstrom supports the holding of Hogg. In Sandstrom, the Court found that an instruction that the law presumes a person to intend the consequences of his acts could have shifted the burden of proof on the element of intent to the defendant: The jury "could have concluded that upon proof by the State of the slaying, and of additional facts not themselves establishing the element of intent, the burden was shifted to the defendant to prove that he lacked the requisite mental state." 442 U.S. at 524, 99 S.Ct. at 2459.
 
 
 51
 The instruction given in this case could have no such effect because it did not create a presumption that the defendant had to overcome. The function of the balancing clause is to ensure that the jury does not hold the defendant responsible for what a reasonable person would know, if in fact the defendant actually believed the fact did not exist. It directs the jury to focus on the defendant's actual belief, nothing more. The clause does not imply anything about whose burden it is to prove the defendant's state of mind. Here, the district court stated unequivocally that the government had to prove that Aguilar was aware of a high probability that the wiretap application existed. The balancing clause in no way lightened that burden.
 
 
 52
 Furthermore, even if the instruction itself were faulty, which I believe is not so, we do not consider jury instructions in isolation, but rather in the context of the other instructions given. Maddox v. City of Los Angeles, 792 F.2d 1408, 1412 (9th Cir.1986). We have held that reminders that the government has the burden of proving every element of the crime beyond a reasonable doubt are sufficient to cure instructions that might otherwise shift the burden of proof. See United States v. Wyatt, 807 F.2d 1480, 1481-82 (9th Cir.), cert. denied, 484 U.S. 858, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987). Considered in context, the knowledge instruction hardly could have led a reasonable juror to conclude that Judge Aguilar had the burden of proving his lack of knowledge. The jury was reminded repeatedly that the government was required to prove every element of the offense beyond a reasonable doubt. And, as we have said, the evidence of Judge Aguilar's knowledge, coming as it did from his own mouth, was overwhelming. Because the jury was cautioned about the government's burden, and because the evidence was so weighty, the instruction could not have been "highly prejudicial" and therefore was not plain error.
 
 
 53
 For the foregoing reasons, I would reject each of Judge Aguilar's objections to his conviction under section 2232(c); moreover, we conclude that any possible error was harmless beyond a reasonable doubt. See post at 641 (O'Scannlain, J., concurring).
 
 III
 OBSTRUCTION OF JUSTICE
 
 54
 The judicial obstruction statute, 18 U.S.C. § 1503,[11] also contains a "knowledge" component. Though the text of the statute prescribes no scienter requirement, this circuit has held that knowledge of a judicial proceeding is an element of a section 1503 offense. See United States v. Washington Water Power Co., 793 F.2d 1079, 1084 (9th Cir.1986); United States v. Rasheed, 663 F.2d 843, 852 (9th Cir.1981), cert. denied, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982). The trial court, therefore, instructed the jury that "there must be knowledge of the existence of a judicial proceeding before a defendant can be convicted of this offense." It then defined knowledge in precisely the same terms it had used in the wiretap instruction.
 
 
 55
 Aguilar challenges his conviction under section 1503 on the ground that the evidence was insufficient to show that he had knowledge that the FBI agents to whom he lied would be witnesses before a grand jury. He also raises the same objections to the court's instruction on "knowledge" that he raised with respect to section 2232(c). For the same reasons that I would hold that the instruction on the "knowledge" element of section 2232(c) properly defined knowledge and did not violate due process, I would hold that the instruction on the knowledge element of section 1503 was also proper. A majority of this panel having concluded otherwise, a decision from which I respectfully dissent, this conviction will be reversed and we do not reach the question of the sufficiency of the evidence. Were it necessary to do so, I would also hold there was sufficient evidence for a rational jury to find Aguilar knew that FBI agent Carlon was expected to be a witness in front of the grand jury. Judge Aguilar clearly knew that a grand jury was meeting, he repeatedly questioned the agents about whether he was a target, and he testified about how grand jury investigations operate, which demonstrated to the jury his ability to correctly determine both his own status and the purpose of the interview. A reasonable jury could have found that a federal judge, sophisticated on the subject of grand jury investigations, who knew that a grand jury was in session and who "was aware of a high probability" that he was a target of its investigation, also knew that Agent Carlon would be expected to testify before the grand jury about Aguilar's statements to him. I therefore would uphold Aguilar's conviction for violating section 1503.
 
 IV
 DEPARTURE FROM THE SENTENCING GUIDELINES
 
 56
 We agree that at a minimum, the district court failed to provide a reasoned explanation for its six-level downward departure, and I concur in Judge O'Scannlain's opinion to that extent. I most vigorously dissent, however, from the conclusion that the district court had the legal authority to depart downward on the basis it did.
 
 
 57
 The mitigating circumstance upon which the district court based its downward departure was the "additional punishment" it anticipated Judge Aguilar would suffer during the course of potential disbarment and impeachment hearings. The plurality acknowledges that the Guidelines account for impeachment, but concludes that the Guidelines do not account for "the likelihood that Judge Aguilar will suffer additional punishment throughout the course of several disciplinary hearings." Post at 643-44 (O'Scannlain, J., concurring). The plurality then concludes that the district court had legal authority to depart on this basis, a conclusion I find insupportable.
 
 
 58
 First, and most fundamentally, departures prompted by the substantial pain and humiliation or financial hardship those in high places suffer when they break the law is inconsistent with the Guidelines' policy that disparity in sentencing should never be occasioned by socio-economic status. See 28 U.S.C. § 994(d) (1988); U.S.S.G. Ch. 1 Pt. A 4(b) & § 5H1.10.[12] The district court emphasized that its willingness to depart "is limited only to those features that I believe are so different and unique with this defendant." It concluded that these features would be "so extensive and so enduring" that they formed an appropriate basis for departure. But there is no escaping the conclusion that the court's departure was grounded in the notion that the consequences that accrue when someone who holds a position of high esteem and importance violates the law are uniquely significant and harsh. Though the court recognized that collateral consequences arising from a criminal defendant's social and professional stature are inappropriate bases for departure, it did not seem to realize that its departure was grounded in precisely such considerations. With respect, I must say that a plurality of this panel now makes the same error.
 
 
 59
 Second, the circumstance upon which the district court based its departure is, regretfully, not all that unique. The Sentencing Guidelines' policy statement on departures states that courts should depart only in the "atypical" case. See U.S.S.G. Ch. 1, Pt. A 4(b); cf. United States v. Anders, 956 F.2d 907, 912 (9th Cir.1992) (factors "not ordinarily relevant" may be considered only in "extraordinary circumstances"), cert. denied, --- U.S. ----, 113 S.Ct. 1592, 123 L.Ed.2d 158 (1993). The kind of additional humiliation and suffering Judge Aguilar will suffer, while not common, is not "atypical." The district court's reasoning would apply to many well-known figures in the worlds of government and finance who have been prosecuted over the last twenty years. I cannot accept the notion that the humiliation of disbarment or impeachment proceedings is different in kind or degree from the humiliation, shame and stigma borne by numerous other respected community members convicted of serious crimes.[13]
 
 
 60
 No one disputes that Judge Aguilar's job accounts for the collateral consequences he now faces in the form of "long, humiliating, and burdensome" proceedings of disbarment and impeachment, as well as loss of pension benefits and preclusion from public service. See post at 643-44.[14] The plurality finds this permissible, however, because a departure on the basis of Judge Aguilar's job is not based on the judge's "status in society." Id. The plurality's own support refutes this notion: "the phrase 'socio-economic status' refers to an individual's status in society as determined by objective criteria such as education, income, and employment." United States v. Lopez, 938 F.2d 1293, 1297 (D.C.Cir.1991) (emphasis added). In our society, rightly or wrongly, one's job is often equivalent to one's status in society. What is more, the plurality buttresses its conclusion that departure on the basis of Aguilar's job is permissible on the additional basis that Judge Aguilar stands to lose his pension too. See post at 644-45. How one could assert that financial ramifications of conviction is not a socio-economic factor is beyond comprehension.
 
 
 61
 A criminal conviction may mean a loss of current position and foreclosure of future professions or positions for many defendants. Professionals in the securities industry, once convicted of violating the securities laws, lose their brokers' licenses in quasi-judicial proceedings not unlike disbarment, and thereafter are barred from holding certain positions in the securities industry. See 15 U.S.C. § 78o(a), (b)(4) (1988). Likewise, persons convicted of certain offenses are barred from holding positions within a labor union or pension plan, see 29 U.S.C. §§ 504(a), 1111 (1988)--ironically, the genesis of Rudy Tham's solicitation of Judge Aguilar's influence and this case. I doubt any court would support a downward departure for a securities broker convicted of insider trading violations on the ground that she faced a burdensome civil liability proceeding, stood to lose her broker's license, would be barred from registering as a securities broker or dealer in the future, had to disgorge her profits, and suffered extreme public humiliation as she was drummed out of Wall Street. I cannot see that Judge Aguilar's position is so different.
 
 
 62
 The Guidelines' policy is that "persons who abuse their positions of trust ... generally are viewed as more culpable." U.S.S.G. § 3B1.3 comment. (backg'd). We must assume that the Sentencing Commission has adequately considered the special circumstances of defendants who hold high office, and rejected any notion that such persons should receive more lenient treatment. The district court's departure on the basis of consequences flowing from Judge Aguilar's breach of the public trust flies in the face of the Guidelines' policy. Collateral consequences of conviction arising from or affecting one's job simply are not a permissible basis for departure. See United States v. Rutana, 932 F.2d 1155, 1158-59 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991).
 
 
 63
 "A long course of adversarial proceedings" awaits many a defendant following criminal conviction--be they forfeiture proceedings, civil suits seeking tort damages, or administrative proceedings to revoke professional licenses. These suits are burdensome in themselves, and their consequences can be exceedingly onerous. Defendants can lose their homes, investments, businesses, and entire estates in forfeiture proceedings following conviction of drug or racketeering offenses, or can be hit with staggering civil damage awards for many white collar crimes. Judge Aguilar's potential forfeiture of his pension rights is no different. Personal financial hardship is not a permissible basis for downward departure. U.S.S.G. § 5K2.12.
 
 
 64
 The plurality's statement that the 'extra punishment' Judge Aguilar faces "can be distinguished" from other collateral effects arising from conviction, see post at 644 n. 3, is not convincing. First, the plurality addresses only deportation; the collateral effects more comparable to what Judge Aguilar faces are personal financial hardship and foreclosure of career opportunities. I submit that despite the fact that deportation "is not considered punitive," its "undeniable impact" is far more punitive than mere loss of position. For that matter, disbarment is not considered punitive either:
 
 
 65
 It must be noted that although the word 'punishment' is frequently used, the discipline of an attorney is not punitive in character.... The purpose of such a proceeding is to determine the fitness of an officer of the court to continue in that capacity, and it has been said the disbarment of attorneys is not intended for the punishment of the individual, but for the protection of the courts and the legal profession.
 
 
 66
 Marsh v. State Bar, 2 Cal.2d 75, 39 P.2d 403, 405 (1934); accord In re Lavine, 126 F.Supp. 39, 48 (S.D.Cal.1954), rev'd on other grounds, 217 F.2d 190 (9th Cir.1954); United States ex rel. Fitzgerald v. Stump, 112 F.Supp. 236, 237 (D.Alaska 1953).
 
 
 67
 Second, because deportation is a normal collateral consequence of conviction for a drug offense, the plurality assumes the Sentencing Commission adequately considered it in determining the appropriate offense level for drug crimes. Apart from the fact that this logic is fallacious--the offense levels for drug convictions were set for aliens and citizens alike, so the consequence of deportation could not possibly be reflected in the offense level for drug crimes--the same reasoning would apply here: disbarment as a consequence of a serious criminal conviction is not rare, and indeed ought to follow as a matter of course. In re Quimby, 359 F.2d 257, 258 (D.C.Cir.1966) (per curiam). Accordingly, by the plurality's logic, we should assume the Sentencing Commission adequately allowed for that circumstance in determining offense levels.
 
 
 68
 Of course, we need not rely on fictional assumptions since the Commission expressly considered the factors upon which the district court seeks to depart--and pronounced each of them either irrelevant, see U.S.S.G. §§ 5H1.10 (socio-economic status), 5H1.11 (public service), or a basis for harsher treatment, cf. id. §§ 3B1.3 (court must adjust upward for abuse of position of trust); 5E1.4 (court must impose forfeiture upon convicted defendant as provided by law).
 
 
 69
 In short, I see no meaningful distinction, either qualitative or quantitative, between the additional "punishment" Judge Aguilar faces and that suffered by hundreds of convicted criminals. The plurality states that Judge Aguilar's case "does not appear to fall within the heartland of cases for which the Guidelines were designed." Post at 645. Judge Aguilar's case--his conduct and offense of conviction--is not at issue here. What the plurality of course means is that Judge Aguilar's personal circumstances are not those of the average defendant, and because of those circumstances, the Guideline sentence for Judge Aguilar's offense appears unduly harsh. That assessment is equally true for hundreds of decent and sympathetic defendants now serving time in federal prisons. The response to this severity cannot take the form of special justice simply because Judge Aguilar is "the first convicted federal judge" upon whom it will be visited.
 
 
 70
 When a high-ranking member of the judiciary, especially a respected and popular judge, is arrested for a serious crime, the entire judicial system is placed on trial. The world waits to see if judges can judge other judges fairly and equally.
 
 
 71
 Alan M. Dershowitz, Justice on Trial, N.Y. Times, Nov. 18, 1992, at A27. No judge can be treated more leniently than would a nonjudicial defendant in a comparable case. To accord Judge Aguilar special consideration on the basis of his position is to violate the fundamental premise not only of the Guidelines, but of this nation: equal justice for all.
 
 
 72
 The circumstance upon which the court based its departure was inconsistent with the rules and policies of the Sentencing Guidelines and therefore in violation of 18 U.S.C. § 3553(b) as interpreted by this Court in Lira-Barraza.[15] I would hold that the district court, on remand, may not depart downward on the basis of consequences stemming from Aguilar's judicial position.[16]
 
 Conclusion
 
 73
 In sum, we hold that the evidence was sufficient for a rational jury to find that Judge Aguilar had knowledge of the wiretap, and that the use of section 2232(c) to punish Judge Aguilar for disclosing the wiretap did not violate his rights under the First Amendment. Judge Aguilar's conviction for violating 18 U.S.C. § 2232(c) is therefore AFFIRMED. I would also hold that the jury instruction did not misstate the "knowledge" element of section 2232(c) and that the instruction did not unconstitutionally shift the burden of proof.
 
 
 74
 I would also hold that the evidence was sufficient for a rational jury to find Judge Aguilar had knowledge that Agent Carlon would be a witness before the grand jury, that the jury instruction did not misstate the "knowledge" element of section 1503, and that the instruction did not unconstitutionally shift the burden of proof. I therefore respectfully dissent from the panel's decision that Judge Aguilar's conviction for violating 18 U.S.C. § 1503 must be REVERSED.
 
 
 75
 On the government's cross appeal, we hold that the district court failed to include a reasoned explanation of the extent of its departure as required by Lira-Barraza. Judge Aguilar's sentence is therefore VACATED and the case is REMANDED to the district court for resentencing. I would also hold that the district court lacked authority to depart downward from the offense level prescribed by the Sentencing Guidelines based on the additional "punishment" awaiting Aguilar. I most vigorously dissent from the panel's contrary decision.
 
 
 76
 See p. 626 for dissent by Judge Hug and special concurrence by Judge O'Scannlain.
 
 
 77
 HUG, Circuit Judge, dissenting, but concurring in Part II of Judge O'SCANNLAIN'S opinion.[1]
 
 
 78
 I respectfully dissent. It is important to keep in mind that Judge Aguilar was acquitted of the charge that was the major focus of this trial--the charge of conspiracy to influence Judge Weigel concerning a case pending in his court. Judge Aguilar was convicted of two peripheral charges that, in my opinion, cannot be sustained. The statutes that form the basis for these charges have to be stretched far beyond their intended application to be made applicable to the facts of this case. I would reverse both charges on the ground of insufficiency of the evidence because the facts of this case, viewed in the light most favorable to the Government, simply do not meet the statutory requirements for conviction.
 
 
 79
 Moreover, I would reverse both convictions, even if the evidence were deemed to be sufficient, on the ground that the district judge gave an erroneous knowledge instruction. Knowledge of certain essential facts was an element of both of the crimes of which Judge Aguilar was convicted. The instruction on knowledge that was given by the court permitted the jury to convict on a finding that there was a "high probability" that Judge Aguilar knew the crucial facts, rather than that he was actually aware of the crucial facts. This is a serious departure from the precedent in our circuit on the requirement of knowledge. The instruction given was one that is intended for a case where a "deliberate blindness" instruction is justified. We have carefully circumscribed the situations in which such an instruction can be given. Primarily, the instruction has been used in drug or alien smuggling cases, where the facts justify a finding that there was a high probability that the defendant knew what was going on and deliberately chose not to find out. Thus, the defendant was maintaining a "deliberate blindness," sometimes designated as a "deliberate ignorance." There are no facts that justify such a finding in this case. The Government does not even contend that this is a "deliberate blindness" case. Rather, the Government contends, and Judge Hall's opinion accepts the proposition, that this "high probability" instruction is an appropriate definition of knowledge in all cases.
 
 
 80
 This erroneous instruction to the jury on an essential element of both crimes cannot be overlooked as being harmless beyond a reasonable doubt. There was clearly a genuine factual issue as to whether Judge Aguilar had the requisite knowledge in each count. Whether the jury was required to find that Judge Aguilar knew of the existence of the essential facts or was only aware of the high probability of their existence could make a crucial difference. The error was not harmless.[2]
 
 I. FACTS
 
 81
 Because Judge Aguilar was acquitted of the main charge of conspiracy to influence Judge Weigel, it is fair to view the facts related to this charge from Judge Aguilar's perspective, as the jury apparently did.
 
 
 82
 Abe Chapman is related to the Aguilar family by marriage. He is the step-grandfather of Judge Aguilar's nephew, Steve Aguilar. Although Judge Hall's opinion describes Abe Chapman in sinister tones, from Judge Aguilar's perspective he was an alcoholic, semi-senile 83-year-old man whom the family often referred to as "Mr. Magoo."
 
 
 83
 Chapman wanted to help his friend Rudy Tham, who had been a labor leader, had been convicted of embezzling $2,000, had served six months, and was then on supervised release. Tham sought to overturn his conviction in a 28 U.S.C. § 2255 proceeding so that he could resume his position as an officer of the local union that he had formed and organized. Chapman and Tham's attorney, Edward Solomon, sought Judge Aguilar's help. Chapman and Solomon wanted Judge Aguilar to attempt to improperly influence Judge Weigel in his ruling on this section 2255 petition. However, the jury found that Judge Aguilar did not do so and did not ever agree to do so. Judge Weigel, a highly respected senior district judge, firmly testified that Judge Aguilar made no attempt to influence him in the Tham case.
 
 Judge Aguilar testified:
 
 84
 In a 2255 petition or other petition, you talk about the procedural matters, how to get the matter to court. And that's what I was talking about with them, about how to get this vehicle to court and how to get this matter before the judge, and I never discussed with them at any time the merits of the case. I wasn't concerned with the merits of the case. My concern was only helping them on what they should do procedurally.
 
 
 85
 There is no doubt that Judge Aguilar should not have put himself in the position of giving legal advice in a case pending before a fellow district judge. This is inappropriate for a judge and may well be a violation of judicial ethics, but it is not a crime. As the jury acquitted Judge Aguilar of the conspiracy charge, it was obviously satisfied with this explanation.
 
 
 86
 Judge Aguilar also was acquitted of the charge that he obstructed justice by trying to influence Solomon to testify falsely before a grand jury. It is important to note that the evidence related to this charge, quoted in Judge Hall's opinion, must be viewed in the light that Judge Aguilar was acquitted of this charge.
 
 
 87
 The foregoing discussion is intended to allow me to focus on the specific facts of the charges of which Judge Aguilar was convicted, without our decision being colored by the facts of the charges of which he was acquitted. I now turn to the specific charges of which Judge Aguilar was convicted and the facts involved in those charges.
 
 II. WIRETAP CHARGE
 A. Summary of Reasons for Reversal
 
 88
 As previously mentioned, there are two reasons why the wiretap charge under 18 U.S.C. § 2232(c) (1988) cannot be sustained. The first is the insufficiency of the evidence under the statute as it must properly be interpreted. The second is that knowledge of certain facts is a central element of the crime, and the court's instruction defining knowledge was erroneous and was not harmless error.
 
 
 89
 Before I embark upon a detailed analysis of the statute and the facts, a summary of the reasons why the evidence is insufficient to sustain the conviction on this charge may be helpful. It is not a crime under section 2232(c) to notify someone that you suspect that your telephone or his telephone is being tapped or that he might be intercepted on someone else's telephone tap. In order for there to be a violation of section 2232(c), a person must have knowledge of an authorization or application for an authorization to intercept a wire communication and then give notice or attempt to give notice to someone to impede such interception. Judge Aguilar was charged with giving notice of an application for an authorization to intercept a wire communication. In order for the statute to apply, the interception allegedly impeded had to be one authorized as a result of that application--otherwise it could not qualify as "such interception." Thus, Judge Aguilar's viewing on February 6, 1988 of an FBI agent's surveillance of Chapman entering and leaving Judge Aguilar's house and his subsequent warning that phones might be tapped, could not constitute a violation of the statute. It is only if the notification can be tied to Judge Peckham's conversation, six months before, that the statute conceivably could be violated.
 
 
 90
 In her discussion of section 2232(c), Judge Hall completely omits the statute's specific reference to "such interception." See Judge Hall's opinion at 614. Judge Hall states that "[t]he statute imposes liability on anyone 'having knowledge that a Federal investigative or law enforcement officer has been authorized or has applied for authorization' to conduct a wiretap." Id. However, the statute must be read in its entirety; the statute imposes liability on anyone "having knowledge that a Federal investigative or law enforcement officer has been authorized or has applied for authorization ... in order to obstruct, impede or prevent such interception." See 18 U.S.C. § 2232(c) (emphasis added).
 
 
 91
 Judge Peckham's purpose in mentioning the wiretap to Judge Aguilar was simply to let Judge Aguilar know that it might not be wise for Judge Aguilar to be associating with Chapman because of an appearance of impropriety. He stated that Chapman's name had come up in connection with an application for a wiretap authorization and that he had, as an Assistant United States Attorney, prosecuted Chapman many years earlier on a criminal charge. The application that Judge Peckham referred to was an application to tap the telephone of Rudy Tham. This application resulted in an authorization to tap Tham's telephone from April 20, 1987 to May 20, 1987. The authorization, resulting from the application, had long since expired by the time Judge Peckham spoke to Judge Aguilar. Even assuming that the information Judge Peckham conveyed to Judge Aguilar was sufficient to give Judge Aguilar knowledge that Chapman was an authorized interceptee, there was no way in which the interception authorized as a result of that application could have been impeded by any notification to Chapman. The authorization had expired. It is all the more clear that eight months thereafter any notification to Chapman could not have violated the statute.
 
 
 92
 It is only if the statute could be stretched to mean that once an application for authorization to wiretap was filed, notification at any time thereafter would be a violation, that Judge Aguilar's conviction could be upheld. This is a misconstruction of the statute. An application ends with the granting or the denying of an authorization. If the authorization is denied, there can be no interception resulting therefrom. If the authorization is granted, the authorization terminates in 30 days. Any new authorization or extension requires a new application. See 18 U.S.C. § 2518(5) (1988).
 
 
 93
 The Government and the opinions of Judge Hall and Judge O'Scannlain seek to avoid this problem by focusing on whether Judge Aguilar knew on February 6, 1988 that there was a wiretap on Chapman's telephone. This would have entailed a new application and authorization. Whether Judge Aguilar "knew" or merely "suspected" that there was a new application and authorization presents a serious factual issue for the jury. The erroneous instruction equating "high probability" with "knowledge" could not be a harmless error. There is a critical distinction between the two concepts.
 
 B. Insufficiency of the Evidence
 
 94
 With this general introduction, I will explain in more detail why the evidence is insufficient to convict under section 2232(c). Judge Aguilar was convicted of Count Six, which charged the following:
 
 
 95
 On or about February 6, 1988, in the Northern District of California, defendant, Robert P. Aguilar while a United States District Judge, having knowledge that a Federal investigative officer had applied to the United States District Court for the Northern District of California for authorization to intercept wire communications of Abe Chapman, and in order to obstruct, impede, and prevent such interception, gave notice and attempted to give notice of the possible interception to Abe Chapman. In violation of Title 18, United States Code, Section 2232(c).
 
 
 96
 Judge Aguilar argues that there was insufficient evidence to convict him of this count. I agree.
 
 Section 2232(c) provides in part:
 
 97
 Notice of Certain Electronic Surveillance.--Whoever, having knowledge that a Federal investigative or law enforcement officer has been authorized or has applied for authorization under chapter 119 to intercept a wire, oral, or electronic communication, in order to obstruct, impede, or prevent such interception, gives notice or attempts to give notice of the possible interception to any person shall be fined under this title or imprisoned not more than five years, or both.
 
 
 98
 18 U.S.C. § 2232(c) (emphasis added).
 
 
 99
 This language requires a pending application for authorization or an authorization that has not expired. The Government argues that, under section 2232(c), it is sufficient if, at some time in the past, there was a wiretap application; it does not matter, under the Government's theory, if the wiretap application has already been denied or if authorization has been granted but has already expired. This is not a reasonable construction of the statute.
 
 
 100
 The plain language of the statute makes it clear that the purpose of the statute is to prevent interference with "possible interception." It is possible that disclosure of an existing wiretap can lead to interference with interception. It also is possible that disclosure of a pending wiretap application, if the application is subsequently authorized, can lead to interference with interception. However, disclosure of an application that already has been denied, or whose authorization already has expired, cannot possibly interfere with "such interception." The language, "such interception," shows that the statute pertains to the particular application or authorization of which the defendant has knowledge. The defendant must intend to impede an interception from the specific application or authorization of which he has knowledge.
 
 
 101
 The statute's requirement of knowledge of either wiretap applications or wiretap authorizations further demonstrates that the statute applies only to pending applications and unexpired authorizations. If Congress was concerned with the disclosure of wiretap applications even when the applications were no longer pending, it would have been unnecessary to include any language about authorizations; there is never an authorization without an application. There is no indication in the statute that Congress was concerned with expired authorizations, regardless of whether they are the subject of secrecy orders.
 
 
 102
 Section 2232(c), read with the language essential to this charge, is as follows:Whoever having knowledge that a Federal ... officer ... has applied for ... authorization ... to intercept a wire ... communication in order to obstruct ... such interception gives notice or attempts to give notice of the possible interception to any person shall be fined ... or imprisoned....
 
 
 103
 (Emphasis added.)
 
 
 104
 I conclude that the statutory language is quite clearly directed to disclosure of a wiretap that could possibly result from the application of which the defendant has knowledge--not from some later application, which would require a completely new justification under 18 U.S.C. § 2518(5) (1988). At the very least, this is a reasonable construction of the statute. Judge Hall's opinion arrives at a different construction and rejects this construction. See Judge Hall's opinion at 615. In my opinion, Judge Hall's construction is an unwarranted expansion of the statutory language, and one which ignores the crucial phrase "such interception." However, even if Judge Hall's interpretation were possible because of some ambiguity, the more lenient construction is required. To reject a reasonable construction of a statute is incompatible with the rule of lenity. "In interpreting the substantive ambit of criminal prohibitions, ambiguities must be resolved in favor of the criminal defendant." United States v. Baxley, 982 F.2d 1265, 1270 (9th Cir.1992); see United States v. Batchelder, 442 U.S. 114, 121, 99 S.Ct. 2198, 2202, 60 L.Ed.2d 755 (1979); Simpson v. United States, 435 U.S. 6, 14, 98 S.Ct. 909, 913, 55 L.Ed.2d 70 (1978). I find the plain language of the statute to be clear, but even if it were possible to wring Judge Hall's construction out of some ambiguity in the statute, it would violate the rule of lenity to do so.
 
 
 105
 Furthermore, there is no indication that "the statute's primary concern is with the giving of notice with specific intent to interfere with surveillance" in general, as Judge Hall contends. See Judge Hall's opinion at 615. The statute does not impose liability on a defendant who interferes with "any future surveillance" or "any future wiretap." Rather, it imposes liability on a defendant who has knowledge of a particular wiretap application or authorization and who gives another person notice of "the possible interception" in an effort to obstruct "such interception." See 18 U.S.C. § 2232(c). Judge Hall's expansive interpretation ignores the plain language of the statute.
 
 
 106
 First Amendment concerns also convince me that section 2232(c) cannot be construed to punish disclosure of all applications regardless of whether the applications are still pending. Statutes must be construed, if at all possible, to avoid constitutional problems. See Blitz v. Donovan, 740 F.2d 1241, 1244 (D.C.Cir.1984). The Government may regulate speech in order to promote a compelling state interest if it employs the least restrictive means to further that interest. Sable Communications of California, Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). The Government does not have a compelling interest in prohibiting the disclosure of all wiretap applications because in many cases there is no danger of interference with a wiretap. The statute, as the Government interprets it, would punish constitutionally protected speech as well as constitutionally unprotected speech. The statute would therefore be overbroad and void on its face. See Clark v. City of Los Angeles, 650 F.2d 1033, 1039 (9th Cir.1981) ("overbreadth doctrine holds that a law is void on its face if it sweeps within its ambit not solely activity that is subject to governmental control, but also includes within its prohibition the practice of a protected constitutional right"), cert. denied, 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 443 (1982). Thus, to avoid this constitutional problem, we must construe the statute to prohibit the disclosure of pending applications and unexpired authorizations only.
 
 
 107
 The Government admits that the statute is "explicitly directed at those who disclose the existence of the wiretap in order to impede interceptions." Nevertheless, the Government argues that the existence of a wiretap or pending application is unnecessary because the statute criminalizes attempts. Thus, the Government maintains, an attempted notification is sufficient for a conviction even if the defendant erroneously believes that there is a pending wiretap application or authorization, whereas in actuality no such application or authorization exists.
 
 
 108
 Section 2232(c) is not a classic attempt statute. The classic attempt statute criminalizes an attempt to violate another statute or another statutory subsection. See, e.g., 18 U.S.C. § 1113 (1988) (criminalizing an attempt to commit murder or manslaughter; murder criminalized by 18 U.S.C. § 1111 (1988) and manslaughter criminalized by 18 U.S.C. § 1112 (1988)); 18 U.S.C. § 1201(d) (1988) (criminalizing an attempt to violate 18 U.S.C. § 1201(a)(4) (1988), which prohibits the kidnapping of foreign officials). There is not a statute that criminalizes attempts to violate section 2232(c), and section 2232(c) does not criminalize an attempt to violate another statute or statutory subsection.
 
 
 109
 Section 2232(c) itself punishes someone who "gives notice or attempts to give notice" of possible interception. (Emphasis added.) Therefore, we must examine the language of section 2232(c) to discover whether an erroneous belief that there is a wiretap application is sufficient for conviction. A reading of the statute demonstrates that the word "attempt" modifies only the words "to give notice." There is no modification of the language that requires "knowledge that a Federal investigative or law enforcement officer has been authorized or has applied for authorization" to tap someone. (Emphasis added.) Therefore, regardless of whether the defendant notifies or attempts to notify someone of possible interception, the defendant must have knowledge of the pending wiretap application or authorization.[3]
 
 
 110
 The only application about which Judge Aguilar arguably could have had any knowledge was the application mentioned by Judge Peckham. This application had resulted in the authorization to tap Rudy Tham's telephone and had expired by the time Judge Peckham spoke to Judge Aguilar. Therefore, there was no possibility that Judge Aguilar by any notification could have impeded an interception authorized as a result of that application.
 
 C. Knowledge Instruction
 
 111
 Even if we accept the Government's view that the knowledge required is that there was in the past an application, and that after observing the FBI's surveillance, Judge Aguilar put "two-and-two together" and therefore "knew" that wires were being tapped, and that Chapman was designated as an authorized interceptee, the erroneous knowledge instruction requires reversal.
 
 
 112
 The district court gave the following instruction defining knowledge:
 
 
 113
 Knowledge of a fact, members of the jury, means that you're satisfied from the evidence that he knew it[.] Or knowledge of the existence of a particular circumstance may be satisfied by proof that the defendant was aware of a high probability of the existence of that circumstance[,] unless you find from the evidence that the defendant actually believed that the circumstance did not exist.
 
 
 114
 (Emphasis added.)
 
 
 115
 This instruction was erroneous. There is clearly a difference between knowledge and an awareness of a high probability that a circumstance exists. A person knows of a circumstance if he or she is aware of that circumstance.
 
 
 116
 The Model Jury Instruction for the Ninth Circuit instructs that "[a]n act is done knowingly if the defendant is aware of the act and does not act [or fail to act] through ignorance, mistake, or accident." Model Jury Instruction 5.06 (1992) (emphasis added).[4] If awareness is knowledge, when a person is aware of a high probability that a circumstance exists, then what the person "knows" is that there is a high probability that the circumstance exists. Knowledge that there is a high probability that a circumstance exists cannot be equated, however, with knowledge that the circumstance itself exists. Furthermore, one can be aware of a high probability that something exists and actually believe that it exists, yet this is far short of knowing it exists. One cannot know something that does not exist. Yet, one can be aware of a high probability that a circumstance exists, and even believe that it exists, despite the fact it does not exist.
 
 
 117
 The knowledge instruction at issue in the instant case was based on Model Penal Code § 2.02(7) which states:
 
 
 118
 Requirement of Knowledge Satisfied by Knowledge of High Probability. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist.
 
 
 119
 Both the Government and Judge Hall contend that this is an accurate definition of knowledge. I disagree.
 
 
 120
 According to the Model Penal Code, a person generally "is not guilty of an offense unless he acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense." Model Penal Code § 2.02(1). Comment 9 to section 2.02(7) makes it clear that section 2.02(7) is only to be used to fulfill the "knowingly" requirement when willful ignorance is an issue. Comment 9 states:
 
 
 121
 Subsection (7) deals with the situation that British commentators have denominated "wilful blindness" or "connivance," the case of the actor who is aware of the probable existence of a material fact but does not determine whether it exists or does not exist.
 
 
 122
 Model Penal Code § 2.02(2)(b) further demonstrates that section 2.02(7) is not a "comprehensive definition" of knowledge, as Judge Hall contends it is. See Judge Hall's opinion at 619. Section 2.02(2) is entitled "Kinds of Culpability Defined." Each crime described in the Model Penal Code requires a specific kind of culpability. Section 2.02(2)(b) defines the culpable state of "knowingly" and includes the definition for knowledge of a circumstance. It provides in relevant part:
 
 
 123
 A person acts knowingly with respect to a material element of an offense when:
 
 
 124
 (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist....
 
 
 125
 Model Penal Code § 2.02(2)(b) (emphasis added). If section 2.02(7) were a comprehensive definition of knowledge, as Judge Hall maintains it is, there would be no need for section 2.02(2)(b) which is, in fact, the Model Penal Code's general definition of knowledge.
 
 
 126
 I am convinced that Model Penal Code § 2.02(7) is relevant only when there is evidence of willful blindness. In United States v. Jewell, 532 F.2d 697 (9th Cir.) (en banc), cert. denied, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976), this court considered a case in which the defendant purposely avoided learning whether there was marijuana in the car he was driving from Tijuana, Mexico, to California. In finding that the defendant "knew" of the marijuana, this court recognized that " 'knowingly' includes a mental state in which the defendant is aware that the fact in question is highly probable but consciously avoids enlightenment...." Id. at 704 (emphasis added). If, as Judge Hall and the Government contend, an awareness that a fact is highly probable constitutes knowledge, then the italicized part of the quoted sentence would be superfluous.
 
 
 127
 The Jewell court went out of its way to make it clear that an awareness of a high probability that a circumstance exists is sufficient to fulfill a requirement of knowledge only when the defendant consciously chooses to avoid obtaining positive knowledge. "It is worth emphasizing," we stated, "that the required state of mind differs from positive knowledge only so far as necessary to encompass a calculated effort to avoid the sanctions of the statute while violating its substance." Id. (emphasis added) (footnote omitted). Thus, the Jewell court concluded that deliberate ignorance was sufficient to fulfill the knowledge requirement not because deliberate ignorance is the equivalent of knowledge, but because deliberate ignorance is just as culpable as knowledge. Id. at 700.
 
 
 128
 I can find no decisions by this court or by the Supreme Court that employ section 2.02(7) as a general definition of knowledge. Both the Government and Judge Hall rely on a footnote in Leary v. United States, 395 U.S. 6, 46 n. 93, 89 S.Ct. 1532, 1553 n. 93, 23 L.Ed.2d 57 (1969), for the proposition that section 2.02(7) is a general definition of knowledge. Their reliance on Leary is misplaced. The Leary Court did not purport to adopt section 2.02(7) as a general definition of knowledge. Examination of the footnote reveals that the Court adopted section 2.02(7) only for the purposes of 21 U.S.C. § 176a. The entire footnote states:
 
 
 129
 Nothing in the legislative history of § 176a is of aid in determining the intended scope of the word "knowing," as it is used in that section. In making that determination, we have employed as a general guide the definition of "knowledge" which appears in the Proposed Official Draft of the Model Penal Code, at 27 (1962). The Code provides:
 
 
 130
 "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist."
 
 
 131
 Leary, 395 U.S. at 46 n. 93, 89 S.Ct. at 1553 n. 93 (emphasis added).
 
 
 132
 Leary differs in several important ways from the instant case. In Leary, the defendant was convicted of smuggling marijuana into the United States in violation of 21 U.S.C. § 176a. Drug smuggling is the classic case in which deliberate ignorance is a concern. See Jewell, 532 F.2d at 703 (noting the large number of drug smuggling cases involving conscious avoidance). There is no reason to believe that people who reveal wiretaps or wiretap applications often consciously avoid knowledge of the wiretaps or wiretap applications. Certainly, there is no evidence that Judge Aguilar tried to avoid learning about the wiretaps here.
 
 
 133
 Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), reinforces the conclusion that section 2.02(7) applies only to cases in which deliberate ignorance is a concern. In Turner, the statute at issue, 21 U.S.C. § 174, was virtually identical to the statute at issue in Leary, 21 U.S.C. § 176a. Section 176a was concerned with marijuana smuggling, and section 174 was concerned with narcotics smuggling. The Court concluded, " 'Common sense' (Leary v. United States, supra, 395 U.S. at 46, 89 S.Ct. at 1553) tells us that those who traffic in heroin will inevitably become aware that the product they deal in is smuggled, unless they practice a studied ignorance to which they are not entitled." Id. 396 U.S. at 417, 90 S.Ct. at 653 (citation in original) (footnote omitted).
 
 
 134
 With respect to the statutes involved in both Turner and Leary, there was an obvious congressional intent for juries to infer knowledge. Both section 176a[5] and section 174[6] explicitly permitted juries to infer or presume knowledge. Nothing on the face of section 2232(c) indicates a congressional intent to allow juries to infer or presume knowledge.
 
 
 135
 Moreover, contrary to the Government's contentions, the legislative history of section 2232(c) does not indicate a congressional intent to adopt Model Penal Code § 2.02(7) as a general definition of knowledge. On June 19, 1986, the House Judiciary Committee reported the House bill as H.R. 4952. The report accompanying that bill included a footnote concerning the knowledge requirement for conviction of disclosing a wiretap. See H.R.Rep. No. 647, 99th Cong., 2d Sess. 60, n. 91 (1986). The footnote simply refers to H.R.Rep. No. 1396, 96th Cong., 2d Sess. 32-36 (1980), which accompanied the Criminal Code Revision Act of 1980. The Senate Judiciary Committee issued a report to accompany its own bill, S. 2575. This Senate Report explains that to convict under section 2232(c), "[i]t is required that the defendant have knowledge that the Federal law enforcement or investigative officer has been authorized or has applied for an interception order." S.Rep. No. 541, 99th Cong., 2d Sess. 34 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3588. The report makes no attempt to define knowledge, and the footnote present in the House Report is not contained in the Senate Report. The House eventually substituted the Senate bill for its own, and Congress enacted the Senate bill into law. Therefore, any definitions of knowledge contained in the House Report would be of dubious value in determining Congress's intended definition of knowledge.
 
 
 136
 Even if we were to accept the footnoted reference to H.R.Rep. No. 647 as evidence of congressional intent, it is clear from the report that Congress did not intend to adopt Model Penal Code § 2.02(7) as a general definition of knowledge. The footnote cites pages 32-36 of H.R.Rep. No. 1396. On page 33, the report defines a knowing state of mind as "an awareness of or a firm belief in the existence of the circumstance."
 
 
 137
 The only reference in H.R.Rep. No. 1396 to section 2.02(7) is in the discussion of willful blindness. The Report states:
 
 
 138
 The Model Penal Code language [in Section 2.02(7) ], in the words of its drafters, "deals with the situation British commentators have denominated 'wilful blindness' or 'connivance,' the case of the actor who is aware of the probable existence of a material fact but does not satisfy himself that it does not in fact exist." Model Penal Code section 2.02, Comment at 129-30 (Tent. Draft No. 4, 1955). The Committee intends to incorporate this Model Penal Code concept as that concept has been explained in such Federal cases as United States v. Jewell, 532 F.2d 697 (9th Cir.), cert. denied, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); and United States v. Jacobs, 475 F.2d 270 (2d Cir.), cert. denied, sub nom. Thaler v. United States, 414 U.S. 821, 94 S.Ct. 131, 38 L.Ed.2d 53 (1973).
 
 
 139
 Id. at 35-36. Both Jewell and Jacobs discuss the language of section 2.02(7) in the context of willful blindness. See Jewell, 532 F.2d at 700-01; Jacobs, 475 F.2d at 287-88.
 
 
 140
 The Government's reliance on United States v. Yermian, 708 F.2d 365 (9th Cir.1983), rev'd on other grounds, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984), is also misplaced. In Yermian, the defendant was convicted of making a false statement in a matter within the jurisdiction of a federal agency, in violation of 18 U.S.C. § 1001 (1976). Id. at 365-66. The issue in Yermian was whether an objective mens rea was sufficient for conviction. The court was not concerned with setting forth a general definition of knowledge. The district court instructed the jury that it could convict the defendant if it found "that the defendant knew or should have known that the information was to be submitted to the government." Id. at 371 (emphasis in original). In Yermian, we were concerned that the "should have known" language imposed an objective standard, and we concluded that a subjective state of mind was necessary. See id. at 372.
 
 
 141
 The instruction in the case at bar differs significantly from the instruction in Yermian. Here, we are not concerned that the instruction imposed an objective standard; we are concerned that it imposed the wrong subjective standard. An awareness of a high probability that a circumstance exists is no doubt a subjective state of mind. Nevertheless, it is a subjective state of mind that differs substantially from the subjective state of mind that is knowledge.
 
 
 142
 The Due Process Clause places the burden on the Government to prove knowledge beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). The instruction relieved the Government of this burden of proof by requiring the jury to infer knowledge from the defendant's awareness of a high probability that a circumstance existed. The instruction was therefore improper.
 
 
 143
 The instruction's balancing clause, which states, "unless you find from the evidence that the defendant actually believed that the circumstance did not exist," does not remedy the flawed instruction. This clause merely made the conclusive inference rebuttable. The burden of rebuttal was placed on the defendant. Under Sandstrom v. Montana, 442 U.S. 510, 521, 99 S.Ct. 2450, 2458, 61 L.Ed.2d 39 (1979), this burden shifting is constitutional error. See United States v. Hogg, 670 F.2d 1358, 1363-64 (4th Cir.1982) (instructing jury to infer knowledge from deliberate avoidance unless defendant believed circumstance did not exist was constitutional error). The instruction allowed the jury to convict Judge Aguilar even if he was uncertain about whether there was a wiretap application or authorization. See United States v. North, 910 F.2d 843, 886 (D.C.Cir.) (requirement that defendant prove he lacked a belief reverses the burden of proof; knowledge does not mean lack of knowledge), superseded on other grounds, 920 F.2d 940 (1990), cert. denied, --- U.S. ----, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).
 
 D. Harmless Error
 
 144
 The erroneous knowledge instruction could not be harmless beyond a reasonable doubt. First, Judge Peckham indicated only that Chapman's name had come up in connection with an application. He did not indicate that Chapman's phone was to be tapped or that Chapman was to be a person whose calls would be intercepted. In providing the information required in an application for a wiretap under 18 U.S.C. § 2518(1) (1988), many persons' names "could come up" in explaining the nature of the investigation without those persons being designated as proposed interceptees. Thus, a question of fact exists as to whether Judge Aguilar "knew" from Judge Peckham's statements that Chapman's calls would be intercepted. This is particularly a fact to be resolved when it is recalled that Judge Peckham was simply trying to advise Judge Aguilar that it might be unwise for him to be seen associating with Chapman, and not to relate to him whose messages were to be intercepted by the wiretap.
 
 
 145
 Secondly, it is important to note that there has been a subtle shift in the Government's position on what it contends Judge Aguilar had to know. The Government contends it is enough to establish that Judge Aguilar knew there was once an application for a wiretap, in which Chapman's name came up, and that "putting two-and-two together" he then knew eight months thereafter that there was a wiretap that could intercept Chapman's messages. Even if we accept this proposition, there is a serious factual question as to what Judge Aguilar could have known and what he merely suspected.
 
 
 146
 If Judge Aguilar had been completely and fully informed of the application about which Judge Peckham spoke, he would have known that there was an application to tap Tham's telephone and that Chapman's messages were designated to be intercepted. Further, he would have known that the authorization was granted on April 20, 1987, and terminated on May 20, 1987. In order for Judge Aguilar to have known that Chapman's messages could be intercepted on February 6, 1988, over eight months after the authorization terminated, he would have had to have known that a new application had been made, with all of the detailed specific requirements of 18 U.S.C. § 2518(1) having been fulfilled and the authorization having been granted by the court. Even an extension of a prior authorization requires a new application complying with section 2518(1). Furthermore, the Tham application mentioned by Judge Peckham was based on a national labor racketeering investigation, an investigation entirely different from the investigation resulting in the later wiretaps. It is very difficult to see how Judge Aguilar possibly could have "known" of these wiretaps as opposed to having had a mere suspicion, based on the then-current surveillance of Chapman and himself. Even if this were the knowledge required, there was a serious question of fact that the jury was required to resolve under the erroneous instruction. It could not have been harmless error.
 
 
 147
 The Government argues, and Judge Hall agrees, that any error in the knowledge instruction is harmless beyond a reasonable doubt because Judge Aguilar stated in a taped conversation three months after the time of the alleged offense that he "knew" they were wiretapping Chapman. See Judge Hall's opinion at 620. We are all familiar with the colloquial expression that we "know" something when we only expect it to be true: "I know it will rain," "I know someone will be elected," "I know the road will be clear." The jury had to evaluate more than this expression; it had to consider what Judge Aguilar actually could have known. He knew that Judge Peckham had stated that Chapman's name had come up in connection with a wiretap application eight months before, and he knew that there was a person, who he believed to be an FBI agent, that appeared to be conducting a surveillance of Chapman. These facts most certainly present a jury question of whether on February 6, 1988 Judge Aguilar really "knew" Chapman's communications were being tapped. The instruction requiring that the jury find only a high probability that he knew, as opposed to requiring actual awareness of the fact, would play a crucial part in guiding the jury's determination of the knowledge element of the crime. It could not be harmless beyond a reasonable doubt.
 
 
 148
 Furthermore, the recent decision of the Supreme Court in Sullivan v. Louisiana, --- U.S. ----, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), indicates that an erroneous instruction on an essential element of the crime can never be harmless because it deprives a defendant of his Sixth Amendment right to have the jury determine that issue of fact. The Sullivan Court held that an erroneous instruction defining reasonable doubt cannot be harmless because the defendant has a Sixth Amendment right to have the jury determine his guilt. Id. at ----, 113 S.Ct. at 2081-83. It does not fulfill Sixth Amendment requirements to have judges hypothesize that a guilty verdict would have been rendered no matter how overwhelming the evidence of guilt might be. Id. at 2081-83.
 
 
 149
 Justice Scalia's opinion in Sullivan states:
 
 
 150
 Harmless-error review looks, we have said, to the basis on which "the jury actually rested its verdict." Yates v. Evatt, 500 U.S. ----, ----, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991) (emphasis added). The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered--no matter how inescapable the findings to support that verdict might be--would violate the jury-trial guarantee.
 
 
 151
 Id.
 
 
 152
 This principle is equally applicable to a finding of an essential element of a crime--in this case, knowledge. In order to render a verdict of guilty, a jury must find all of the essential elements of the crime, under proper instructions. "[A] jury's verdict [of guilty] cannot stand if the instructions provided the jury do not require it to find each element of the crime under a proper standard of proof." Cabana v. Bullock, 474 U.S. 376, 384, 106 S.Ct. 689, 696, 88 L.Ed.2d 704 (1986) (emphasis added) (citing Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)). Here, the jury did not make afinding of knowledge under a proper instruction. For appellate court judges to make this finding, by concluding what the jury would have found under a proper instruction, violates the defendant's Sixth Amendment right to have a jury actually make that finding. It is a structural error of constitutional dimension--the judges, instead of the jury, are making the finding essential to the verdict. See Sullivan, --- U.S. at ---- - --, 113 S.Ct. at 2082-83.
 
 
 153
 Justice Scalia vividly makes this point in his earlier concurring opinion in Carella v. California, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989).
 
 
 154
 The constitutional right to a jury trial embodies "a profound judgment about the way in which law should be enforced and justice administered." It is a structural guarantee that "reflect[s] a fundamental decision about the exercise of official power--a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." A defendant may assuredly insist upon observance of this guarantee even when the evidence against him is so overwhelming as to establish guilt beyond a reasonable doubt. That is why the Court has found it constitutionally impermissible for a judge to direct a verdict for the State.
 
 
 155
 ....
 
 
 156
 In other words, "the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials."
 
 
 157
 ... And the problem would not be cured by an appellate court's determination that the record evidence unmistakably established guilt, for that would represent a finding of fact by judges, not by a jury. As with a directed verdict, "the error in such a case is that the wrong entity judged the defendant guilty."
 
 
 158
 Id. at 268-69, 109 S.Ct. at 2422 (internal citations omitted).
 
 I shall summarize my position:
 
 159
 Judge Aguilar was charged with having knowledge of an application to intercept wire communications and attempting to impede such communications. It is not a violation of section 2232(c) to have knowledge of one application but seek to impede the communications sought to be intercepted by another application.
 
 
 160
 It is clear that Judge Aguilar could not have impeded any interception of communications sought by the application resulting in the April 20, 1987 authorization. The life of that application had long since ended. Judge Hall and Judge O'Scannlain have adopted the Government's position and focused on Judge Aguilar's knowledge of a new wiretap on Chapman's telephone in effect on February 6, 1988. They conclude that by putting two and two together (the knowledge of the earlier application to tap Tham's telephone and the FBI surveillance on the street) that Judge Aguilar "knew" Chapman's telephone was being tapped. See Judge Hall's opinion at 617. Thus, they conclude that this "putting two and two together" is equivalent to actual knowledge and, even more importantly, that this was the only decision the jurors could have reached, even if they were properly instructed on the issue.
 
 
 161
 Following the logic of that approach, it would have to be proved beyond a reasonable doubt that Judge Aguilar knew that a new and different application had been made to tap Chapman's telephone and that Judge Aguilar sought to impede the interception of communications sought in that application. The earlier application was to tap Tham's telephone in an entirely different investigation. It is very difficult for me to see how a jury, even under a proper instruction, could have found that Judge Aguilar "knew" of some new application that authorized the tapping of Chapman's telephone in February of 1988. No doubt he suspected it was true. I can see how a jury under a "high probability" instruction could have determined that Judge Aguilar's strong suspicions constituted enough proof that the requisite knowledge existed. However, there was, at the very least, a serious factual question concerning his knowledge that had to be determined under a correct instruction on the law. The instructional error could not be harmless beyond a reasonable doubt.
 
 III. OBSTRUCTION OF JUSTICE CHARGE
 A. Summary of Reasons for Reversal
 
 162
 There are also two reasons for reversing the obstruction of justice charge. The first is that 18 U.S.C. § 1503, under which Judge Aguilar was charged, does not apply to the facts of this case. The second is that even if section 1503 did apply to the facts of this case, the erroneous knowledge instruction, previously discussed in Section II. C., would require reversal. Knowledge of certain facts are essential elements of the crime, and the erroneous knowledge instruction seriously misinformed the jury about determining these elements of the crime.
 
 B. The Statute Does Not Apply
 
 163
 The conviction on this charge requires reversal because the interpretation of section 1503 cannot be stretched to reach the facts of this case. The facts are that Judge Aguilar, as a target of the investigation, gave misinformation to the FBI, minimizing his involvement with Chapman and attorney Solomon. At most, this is a false statement to the FBI that interferes with its investigation. This type of offense would have to be proved under 18 U.S.C. § 1001 (1988), which concerns false statements to federal agencies. Judge Aguilar was not charged with a violation of section 1001. Furthermore, even under a section 1001 charge, the statute does not apply to certain situations where a truthful response would have incriminated the declarant. This is known as the "exculpatory no" doctrine. We explained the application of section 1001 and the "exculpatory no" doctrine in United States v. Equihua-Juarez, 851 F.2d 1222, 1224 (9th Cir.1988).
 
 
 164
 In the case before us, Judge Aguilar is charged with obstructing justice under section 1503. This requires the obstruction of a judicial proceeding, not simply an FBI investigation. The judicial proceeding he is charged with obstructing is a grand jury investigation of a conspiracy involving himself and others. Judge Aguilar did not coerce, intimidate, or attempt to persuade the FBI agents to testify falsely before the grand jury. He simply misinformed the FBI about the extent of his contacts with Chapman and Solomon. This is not admirable, but it does not constitute the crime of obstructing justice under section 1503.
 
 
 165
 As I state in the next section, there is a serious question as to whether Judge Aguilar had the requisite knowledge that a grand jury was investigating this matter and that these FBI agents were expected to be witnesses. Even assuming he had the requisite knowledge, he did not violate this statute simply by misinforming the FBI of his contacts with Chapman and Solomon. To construe the statute as the Government has in this case would mean that anyone who makes a false statement to any person who is expected to be a witness before a grand jury or any other judicial proceeding about a subject under investigation could be guilty of the crime of obstructing justice. Other statutory sections safeguard against misinformation to a grand jury. False testimony before a grand jury is punishable as perjury. Causing a witness knowingly to testify falsely is suborning perjury. This obstruction of justice statute was simply not intended to extend to the facts of this case. I know of no other reported case where such a charge has been held to be proper, and none has been cited by the Government.[7]
 
 
 166
 Judge Aguilar was convicted of Count Eight, which stated:
 
 
 167
 1. At all times relevant to this count of the indictment, defendant AGUILAR was aware that a federal grand jury in the Northern District of California was investigating possible violations of federal criminal law by ROBERT P. AGUILAR, Abe Chapman, Michael Rudy Tham, and others.
 
 
 168
 2. On or about June 22, 1988, defendant ROBERT P. AGUILAR, while a United States District Judge, did corruptly endeavor to influence, obstruct, and impede the aforementioned grand jury investigation, and thus the due administration of justice in the Northern District of California, by making false and misleading statements to Special Agents of the Federal Bureau of Investigation concerning defendant AGUILAR's assistance to Michael Rudy Tham and concerning defendant AGUILAR's knowledge and disclosure of information concerning court-ordered electronic surveillance of Abe Chapman.
 
 
 169
 In violation of Title 18, United States Code, Section 1503.
 
 
 170
 A brief history of section 1503 is enlightening as to Congress's intended application of the statute. Briefly stated, section 1503, as it was originally enacted in 1948, specifically proscribed certain conduct seeking to influence witnesses in judicial proceedings. The title of the section, as well as the body, indicated that the statute was intended to cover judicial officers, jurors, and witnesses. The full text of the statute is set forth in the margin.[8] In 1982, Congress enacted the Victim and Witness Protection Act, 96 Stat. 1248 (1982). This new statute removed all references to witnesses in section 1503 and enacted a new section, section 1512, addressed specifically to the influencing of witnesses, victims, and informants. The Second Circuit in United States v. Hernandez, 730 F.2d 895, 899 (2d Cir.1984), stated in its conclusion that section 1512 replaced that part of section 1503 that pertained to witnesses. The Hernandez case involved a threat to kill a witness, and the court held that the charge could not be sustained under section 1503. Id.
 
 
 171
 Our court faced a charge of witness tampering under somewhat difference circumstances in United States v. Lester, 749 F.2d 1288 (9th Cir.1984). The facts in the Lester case involved the hiding and bribing of a witness in order to prevent him from testifying in a criminal trial. We disagreed with the broad statement of the Second Circuit in the Hernandez case that "congress affirmatively intended to remove witnesses entirely from the scope of § 1503." Id. at 1295. We distinguished Hernandez, noting that it dealt with intimidation and harassment of a witness, whereas Lester involved non-coercive witness tampering. We observed that section 1512 did not encompass such non-coercive conduct and, thus, concluded that this conduct still remained punishable under the omnibus clause of section 1503. Id. at 1295-96.
 
 
 172
 In 1986, the Second Circuit dispelled any doubts about what was meant by the Hernandez opinion, stating that section 1512 was intended to completely supplant the portion of section 1503 that dealt with witnesses. United States v. Jackson, 805 F.2d 457, 461 (2d Cir.1986), cert. denied, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). This presented a clear conflict with our Lester case.
 
 
 173
 In 1988, Congress obviated this conflict between the Ninth and Second Circuits by amending section 1512 to cover specifically non-coercive witness tampering. This eliminated the problem that we discussed in Lester.[9] Section 1512, as it read at the time of our decision in Lester, was limited to witness tampering by a person who accomplished it or attempted to accomplish it through intimidation, physical force, threats or misleading conduct. This left non-coercive witness tampering untouched unless it could be classified as "misleading conduct." The 1988 amendment to section 1512 inserted the phrase "or corruptly persuades" within the proscribed conduct, thus providing for non-coercive witness tampering. The pertinent part of section 1512 as amended is as follows:
 
 
 174
 (b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
 
 
 175
 (1) influence, delay, or prevent the testimony of any person in an official proceeding;
 
 
 176
 ....
 
 
 177
 shall be fined not more than $250,000 or imprisoned not more than ten years, or both.
 
 
 178
 This amendment was adopted November 18, 1988, approximately five months after the conduct forming the basis for the charge against Judge Aguilar occurred. Thus, in our circuit, under the authority of the Lester opinion, non-coercive witness tampering was still covered under the omnibus clause of section 1503.
 
 
 179
 The importance of the legislative history to this case is that in removing the conflict between the Ninth Circuit and the Second Circuit, Congress indicated what type of non-coercive conduct was meant to be proscribed with regard to witnesses. It is conduct that "corruptly persuades ... or attempts to do so" in order to influence or prevent the testimony of any person in an official proceeding.
 
 Section 1503 currently provides:
 
 180
 § 1503. Influencing or injuring officer or juror generally
 
 
 181
 Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 
 
 182
 18 U.S.C. § 1503 (emphasis added.) The italicized part of this statute is often referred to as the "omnibus clause," and it is the part of the statute that Judge Aguilar is alleged to have violated.
 
 
 183
 In order to sustain a conviction under that clause, it must be found that Judge Aguilar's actions "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice." Congress's translation of this requirement as it pertains to witnesses, by its amendment to section 1512, indicates that the conduct must involve a defendant who "corruptly persuades ... or attempts to [persuade]" a witness so as to influence his testimony.
 
 
 184
 If a person sought to influence the testimony of a witness by bribery or extortion, this would clearly fall within the normally accepted meaning of corrupt. Simply making a false statement to a witness is a far cry from any generally accepted meaning of "corrupt influence" or "corrupt persuasion." To place in contrast the type of conduct that would be corrupt influence, in my opinion, consider the following hypothetical fact situation: FBI agents go to a judge, state that they have done an investigation, and reveal certain facts that they intend to relate to a grand jury, which indicate that the judge had engaged in a conspiracy to influence another judge. If the defendant judge appeals to them not to so testify because it would harm his career, offers them a bribe not to testify, or threatens that he will see that they lose their jobs if they testify--that would amount to an attempt to corruptly influence the FBI agents to change their testimony.
 
 
 185
 Judge Aguilar did not try to tell the FBI agents how to testify, did not try to persuade them not to testify, and did not try to dissuade them from testifying as to what their investigation otherwise revealed. He simply did not tell them the straight story as to his contacts with Chapman and Solomon. This is very different from the other types of activities enumerated in section 1503.
 
 
 186
 There is a significant difference between making a false statement to a potential witness and trying to get a witness to change his or her testimony through threats, force, bribery, extortion or other means of corrupt persuasion. If "corruptly influence" is extended to mean "making false statements to a potential witness," we will have expanded the statute far beyond its reasonable construction. If for no other reason, the rule of lenity would preclude such a construction.
 
 
 187
 An additional reason why the evidence in this case is insufficient to sustain a conviction under section 1503 is the lack of proof that the FBI was acting on behalf of the grand jury. We have interpreted section 1503 as extending only to interference with a pending judicial proceeding. United States v. Brown, 688 F.2d 596, 598 (9th Cir.1982). Interference with a government agency's investigation is insufficient. Id. There is no evidence that a grand jury had authorized or directed the FBI investigation; nor is there evidence that the FBI agents had been subpoenaed to testify. At most, the conduct alleged was interference with an FBI investigation, not a judicial proceeding. The mere fact that the FBI investigation could result in producing evidence that might be presented to a grand jury is insufficient to constitute a violation of section 1503. In Brown, we held that although warning the target of a search warrant did interfere with a police investigation, it did not constitute interference with a grand jury proceeding even though evidence derived from the search might have been presented to a grand jury. See id.
 
 C. Erroneous Knowledge Instruction
 
 188
 Even if section 1503 applied to false statements made to FBI agents, we would have to reverse because the knowledge instruction was erroneous. The violation of section 1503 requires that the defendant know of the pending judicial proceeding and that the FBI agents were expected to be called to testify. See United States v. Washington Water Power Co., 793 F.2d 1079, 1084 (9th Cir.1986). There is a serious question of fact, given the noncommittal responses of the FBI agents, as to whether Judge Aguilar knew a grand jury had been convened and, if so, what it was investigating. Furthermore, it was not at all clear that the agents were expected to be called to testify before a grand jury.
 
 
 189
 In Section II. C., I have discussed the serious error in the knowledge instruction given by the court. Under that instruction, the jury could have convicted Judge Aguilar even if he was not actually aware of the pertinent facts, provided the jury found that there was a "high probability" that he knew. In light of the conflicting evidence, this error could not have been harmless beyond a reasonable doubt. As previously noted, the Supreme Court's recent decision in Sullivan indicates that an erroneous instruction on an essential element of the crime can never be harmless. See --- U.S. at ---- - --, 113 S.Ct. at 2081-83.
 
 IV. CONCLUSION
 
 190
 In conclusion, I would reverse on both counts on the ground of insufficiency of the evidence. The statutes that Judge Aguilar allegedly violated do not extend to the facts of this case. Even if this were not the case, I would reverse and remand for a new trial on the basis that the knowledge instruction was erroneous and prevented the jury from properly deliberating on essential elements of the crimes charged. In neither case can this serious error concerning essential elements of the crime be determined to be harmless beyond a reasonable doubt.
 
 
 191
 O'SCANNLAIN, Circuit Judge, concurring in part:
 
 
 192
 I would affirm Judge Aguilar's conviction for disclosure of a wiretap under 18 U.S.C. § 2232(c) but would reverse his conviction for obstruction of justice under 18 U.S.C. § 1503. Thus, I concur in the result reached by Judge Hall as to Count Six and in the result reached by Judge Hug as to Count Eight.
 
 
 193
 As to the appeal of the sentence, we reject the government's challenge to the district court's decision to depart downward from the Sentencing Guidelines. However, the court failed to follow the procedure set forth in United States v. Lira-Barraza, 941 F.2d 745 (9th Cir.1991) (en banc). Consequently, we must vacate the sentence on Count Six and remand for resentencing.
 
 
 194
 * I agree with Judge Hall that a rational trier of fact could find beyond a reasonable doubt that Judge Aguilar had knowledge of the wiretap application; there clearly was sufficient evidence in the record. Accordingly, I concur in part II.A of her opinion. I also agree that section 2232(c) does not violate the First Amendment as applied to Judge Aguilar. Accordingly, I concur in part II.B of her opinion. I cannot agree, however, with Judge Hall's analysis of the knowledge instruction in parts II.C and II.D of her opinion. I believe that the district court's knowledge instruction was erroneous for the reasons set forth by Judge Hug in section C of his opinion; nevertheless, I conclude that the error, fatal as to Count Eight, was harmless as to Count Six.
 
 
 195
 I believe that Judge Hug's analysis of the knowledge instruction is correct. Therefore, reversal on both counts is required unless the error was logically harmless beyond any reasonable doubt because the record compels a guilty verdict. United States v. Sanchez-Robles, 927 F.2d 1070, 1075 (9th Cir.1991); see also United States v. Alvarado, 838 F.2d 311, 317 (9th Cir.) ("Application of the harmless error doctrine is appropriate where the evidence of guilt is so overwhelming that a conviction is compelled."), cert. denied, 487 U.S. 1222, 108 S.Ct. 2880, 101 L.Ed.2d 915 and 488 U.S. 838, 109 S.Ct. 103, 102 L.Ed.2d 78 (1988). Applying any other standard of review to this erroneous instruction would allow for conviction without establishment of knowledge, an essential element of the offense, beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) (due process requires that each element of an offense be proved beyond reasonable doubt). But see United States v. Valle-Valdez, 554 F.2d 911, 915-16 (9th Cir.1977) (noting some confusion in the cases, but observing that errors in jury instructions are generally considered non-constitutional and therefore the standard from Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), need not apply).
 
 
 196
 * After examination of the record, I conclude that the error was harmless beyond a reasonable doubt with respect to Count Six, the wiretap count. The evidence of Judge Aguilar's knowledge consisted of the following:
 
 
 197
 (1) Both Judge Peckham and Judge Aguilar testified that Judge Peckham had told Judge Aguilar that Chapman's name had come up "in connection with" a wiretap;
 
 
 198
 (2) Judge Aguilar saw an FBI agent photographing Chapman outside Aguilar's house;
 
 
 199
 (3) Steve Aguilar testified that Judge Aguilar told him that he had overheard at work that Chapman was being wiretapped;
 
 
 200
 (4) Three months after Judge Aguilar revealed the wiretap to Chapman, he repeatedly told Solomon in recorded conversations that he knew Chapman's phone was tapped.
 
 
 201
 The strongest evidence against Judge Aguilar is the transcript of his May 17 conversation with Solomon. Because it post-dates Judge Aguilar's alleged violation of section 2232(c) by more than three months, I am reluctant to assign "overwhelming" weight to this evidence. See Judge Hall's Opinion, at 622. Nonetheless, the combination of what Judge Peckham told Judge Aguilar and what Judge Aguilar told Steve Aguilar shows conclusively that Judge Aguilar was substantially certain that Chapman had been or was being tapped. It does not appear that Judge Aguilar received any additional information between the disclosure and his self-incriminating statements. I therefore conclude that the erroneous instruction was harmless beyond a reasonable doubt with regard to Count Six.
 
 B
 
 202
 On the other hand, I cannot conclude that the error was harmless beyond a reasonable doubt as to Count Eight, the obstruction of justice count. The obstruction count requires a showing that the defendant knew: (1) that a grand jury was meeting, and (2) that the person tampered with was expected to be called as a witness before the grand jury. United States v. Washington Water Power Co., 793 F.2d 1079, 1084 (9th Cir.1986). There appears to be no room to doubt that Judge Aguilar knew a grand jury was meeting. Solomon told Judge Aguilar, in a recorded conversation on May 26, 1988, one month before the alleged violation, that the FBI had told him a grand jury was in session. Judge Aguilar indicated his understanding of this information by observing, later in the same conversation, "if they subpoena me I may have a problem."
 
 
 203
 However, the evidence is considerably thinner that Judge Aguilar knew that the FBI agents to whom he lied were expected to be witnesses before the grand jury. There is no direct evidence at all. Nor do Judge Aguilar's prevarications support an unequivocal inference of knowledge. It is equally plausible that he hoped his lies would dissuade the government from seeking an indictment against him.
 
 
 204
 Certainly, as the government points out, the jury could infer that Judge Aguilar, an experienced federal judge, deduced that the investigating FBI agents were likely to be witnesses before the grand jury. The availability of this inference, however, points up the danger of the "high probability" jury instruction. The jury could have concluded that Judge Aguilar did not know the agents were likely witnesses, but should have. In the absence of an instruction precluding conviction for negligence, I cannot be confident the jury did not convict for negligence.
 
 
 205
 Jury instructions are not to be examined in isolation. Maddox v. City of Los Angeles, 792 F.2d 1408, 1412 (9th Cir.1986). The erroneous knowledge instruction could theoretically have been cured by the trial judge's instruction on intent to "impede, interfere with or obstruct the functioning of that grand jury." In my view, however, the intent instruction does not ameliorate the flaw in the knowledge instruction. The jurors may have concluded that Judge Aguilar intended to "obstruct the functioning of the grand jury" by inducing the government not to seek an indictment against him. Yet the government does not argue, and I do not believe, that such a showing is sufficient to violate section 1503. I therefore conclude that the erroneous knowledge instruction requires reversal of the conviction on Count Eight.
 
 II
 
 206
 In imposing sentence, the district court assigned Judge Aguilar an offense level of 16,[1] which carries a sentence of twenty-one to twenty-seven months and a fine of $5000 to $50,000 for persons in criminal history category I. The court then departed downward and assigned Judge Aguilar an offense level of 10 and sentenced him to two six month terms of imprisonment, to be served concurrently, and fined him $1000 on each count. The government appeals the district court's downward departure from the Sentencing Guidelines.
 
 
 207
 Under 18 U.S.C. § 3553(b), the district court must sentence a defendant within the applicable Guidelines range unless "the court finds there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Here, the court offered the following reasons for its departure:
 
 
 208
 I do think Judge Aguilar now commences a long course of adversarial proceedings, ... beginning with the Ninth Circuit Judicial Council, with the state and local bar associations, with the House of Representatives, with the United States Senate. Those proceedings will be long, humiliating, and burdensome and may even bring into play a number of events that are not part of the convictions for which he stands convicted before the court at this time. I think that burden is a major and substantial punishment that warrants some degree of departure downward.
 
 
 209
 The district court emphasized that its willingness to depart was limited only to those features that it believed "are so different and unique with this defendant, ... and are so extensive and will be so enduring that it would be the sort of ground upon which a sentencing commission would favor a court sitting here today using it as a basis for departure."
 
 
 210
 Our review of the departure imposed by the district court involves three steps. United States v. Lira-Barraza, 941 F.2d 745, 746-47 (9th Cir.1991) (en banc). First, we must determine whether the district court had the legal authority to depart from the Sentencing Guidelines. Id. at 746. Second, we review for clear error factual findings supporting the existence of the identified circumstance. Id. at 746-47. Third, we must determine whether a six level departure downward was unreasonable. Id. at 747. Here, because the district court's statement did not include "a reasoned explanation of the extent of the departure founded on the structure, standards and policies of the Act and Guidelines," id., the district court failed to comply with the underlying requirements of the third step of Lira-Barraza and we must remand.
 
 
 211
 On remand, the district court may again choose to depart downward based on the additional punishment awaiting Judge Aguilar. The government vigorously contends that the district court does not have the legal authority to do so. We therefore believe that some comment on the appropriateness of departure is warranted.
 
 
 212
 The district court may depart if it identifies a mitigating circumstance of a kind or to a degree the Commission did not adequately take into account when formulating the Guidelines. Id. at 746. Even if the circumstance is one not adequately considered, the court cannot depart if the circumstance is inconsistent "with the sentencing factors prescribed by Congress in 18 U.S.C. § 3553(a), [and] with the Guidelines...." Id.
 
 
 213
 The mitigating circumstance upon which the district court based its downward departure was the additional punishment it anticipated Judge Aguilar would suffer during the course of potential disbarment and impeachment hearings. The government argues that the Guidelines account for that circumstance in sections 3B1.3 and 3E1.1, which respectively establish an upward adjustment if the defendant has abused a position of trust and a downward adjustment if the defendant accepts responsibility for his actions by resigning his office. See U.S.S.G. §§ 3B1.3, 3E1.1 and comment. (n.1(f)). The court's ruling, however, was not based solely on the likelihood of impeachment, but on the likelihood that Judge Aguilar will suffer additional punishment throughout the course of several disciplinary hearings. The provisions cited by the government cannot be said to account for this circumstance.
 
 
 214
 Nor was this departure "inconsistent with the Guidelines' policy that disparity in sentencing should never be occasioned by socio-economic factors." The district court did not rely on socioeconomic status to support its departure. Rather, the district court relied upon a determination that Judge Aguilar, because he is a federal judge, would be subject to punishment in addition to the court-imposed sentence. Judge Aguilar's job accounts for this extra punishment; the departure was not based on his level of wealth, privilege, or "status in society."[2] Cf. United States v. Lopez, 938 F.2d 1293, 1297 (D.C.Cir.1991). Additional punishment appears to be a valid mitigating factor. Cf. United States v. Lara, 905 F.2d 599, 601-03 (2d Cir.1990) (departure upheld where defendant's vulnerability required prison officials to place him in solitary confinement, increasing the severity of his punishment).[3] Moreover, unlike Judge Hall, we do not consider each particular aspect of the additional punishment facing Judge Aguilar "abstractly and alone," United States v. Cook, 938 F.2d 149, 153 (9th Cir.1991), but instead recognize the "unique combination of factors" that comprises the mitigating circumstance in this case. Id.
 
 
 215
 Judge Aguilar, if he is subjected to impeachment proceedings, will suffer additional punishment by the government, imposed in a public, quasi-judicial proceeding. If convicted upon impeachment, not only will he be removed from his otherwise life-tenured position, he will be disqualified from holding any future government appointive position. See United States v. Brown, 381 U.S. 437, 448, 85 S.Ct. 1707, 1714, 14 L.Ed.2d 484 (1965) ("Disqualification from office may be punishment, as in cases of conviction upon impeachment.") (quoting Cummings v. Missouri, 71 U.S. (4 Wall) 277, 320, 18 L.Ed. 356 (1866)). If convicted upon impeachment, Judge Aguilar will also suffer full forfeiture of his pension rights, a loss of considerable economic significance.[4] Unlike most federal officers and employees, an Article III judge's pension does not vest until he attains at least age sixty-five and meets certain service requirements, typically fifteen years. See 28 U.S.C. § 371. In contrast, had he been an Article I judge such as a bankruptcy judge, or a magistrate judge, Judge Aguilar would have begun vesting upon completion of eight years of service and by now would be nearly fully vested in his right to receive the salary of the office for life beginning at age sixty-five. See 28 U.S.C. § 377. Therefore, unlike an Article I judge, or any other federal official or employee for that matter, an Article III judge who leaves office for any reason prior to the age of sixty-five forfeits all pension rights no matter how many years he may have served. From publicly available material, it appears that Judge Aguilar has served on the bench since 1980; should he leave office before April 15, 1996, the date of his sixty-fifth birthday, he will receive no retirement benefits whatsoever. This will be true whether he resigns voluntarily or suffers impeachment.
 
 
 216
 Thus, the additional formal punishment to be imposed upon Judge Aguilar as a result of his conviction can be distinguished, both qualitatively and quantitatively, from the "substantial pain and humiliation" suffered by criminal defendants who are "well-known figures in the worlds of government and finance." For that reason we reject the suggestion that the additional punishment Judge Aguilar will suffer is not "atypical."[5] See U.S.S.G. Ch. 1, Pt. A4(b). While Judge Hall may be right that "well-known figures" of high social standing appear as criminal defendants all too frequently, the criminal conviction of an Article III judge is, thankfully, still a rare occurrence. Notwithstanding the recent impeachments of several federal judges,[6] Judge Aguilar is the first convicted federal judge to be sentenced under the Guidelines. As such, his case does not appear to fall within the heartland of cases for which the Guidelines were designed. Moreover, we reiterate that the additional punishment identified by the district court is not based upon Judge Aguilar's "personal financial hardship," "foreclosure of career opportunities," or, especially, "loss of position." Judge Hall's Opinion, at 624-25. Thus, we are satisfied that Judge Bechtle had the legal authority to depart; the first element of Lira-Barraza was met.
 
 
 217
 Lira-Barraza also requires us to review for clear error the district court's factual findings supporting the existence of the identified circumstance. Lira-Barraza, 941 F.2d at 746-47. The government argues, in effect, that no factual findings were made as to the possibility that Judge Aguilar might avoid the humiliation of impeachment by resigning. The government's argument, as to step two, is well taken but may be ultimately moot. On remand, the district court should specifically consider whether other additional punishment, such as forfeiture of pension and disbarment, will result in the event of Judge Aguilar's potential resignation to avoid impeachment.
 
 
 218
 "The Guidelines are not a straightjacket for district judges. They do provide discretion to depart." Cook, 938 F.2d at 152. Congress has instructed sentencing courts "to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). In this case, Judge Hall would have us remand for the imposition of a more severe sentence even though we reverse one count of conviction. To do so without allowing the district court to consider in its discretion the additional formal punishment and the unusual financial ramifications that arise because of the appellant's job as an Article III judge would violate Congress's mandate to provide just punishment.
 
 
 219
 In sum, we agree that additional punishment is a permissible basis for downward departure. We remand, however, for the district court to follow the procedures established in Lira-Barraza. In particular, the court must consciously measure the extent of its departure against the sentencing structure established by the Act and the Guidelines. Lira-Barraza, 941 F.2d at 748.III
 
 
 220
 In conclusion, I would affirm Judge Aguilar's conviction as to Count Six, reverse his conviction as to Count Eight, and remand for resentencing in accordance with the foregoing opinion.
 
 ORDER
 
 221
 Sept. 2, 1993.
 
 
 222
 Before: WALLACE, Chief Judge.
 
 
 223
 Upon the vote of a majority of nonrecused regular active judges of this court, it is ordered that this case be reheard by the en banc court pursuant to Circuit Rule 35-3.
 
 
 
 [1]
 Judge Hug's proposition that we view the facts from Judge Aguilar's perspective because the jury acquitted him on the conspiracy charge is novel, to say the least. See post at 627-28 (Hug, J., dissenting). The acquittal did not prove Aguilar's innocence; at most it proves a reasonable doubt as to his guilt. See United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361-62, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984). We have no way of knowing whether the jury acquitted Aguilar on the evidence or by way of mistake, compromise or lenity. See United States v. Powell, 469 U.S. 57, 65, 105 S.Ct. 471, 476, 83 L.Ed.2d 461 (1984). We do know that the jury did not credit all of Judge Aguilar's testimony, given the two convictions. We view the evidence and the inferences to be drawn therefrom in the light most favorable to the verdicts. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992)
 
 
 [2]
 Whoever, having knowledge that a Federal investigative or law enforcement officer has been authorized or has applied for authorization under chapter 119 to intercept a wire, oral, or electronic communication, in order to obstruct, impede or prevent such interception, gives notice or attempts to give notice of the possible interception to any person shall be fined under this title or imprisoned not more than five years, or both
 18 U.S.C. § 2232(c) (1988).
 
 
 [3]
 Contrary to the dissent's characterization, we do not conclude that Judge Aguilar had knowledge of the new wiretap on Chapman's telephone in effect during February 1988. See post at 636 (Hug, J., dissenting). Rather, we conclude that the evidence of his knowledge of the May 1987 wiretap on Tham's telephone is sufficient to support his conviction for the February 6 disclosure of that wiretap to Chapman, an interceptee of that wiretap
 
 
 [4]
 We note that impossibility is generally not a defense to a crime. See, e.g., United States v. Quijada, 588 F.2d 1253, 1255 (9th Cir.1978) ("generally, a defendant should be treated in accordance with the facts as he supposed them to be."). The fact that the particular wiretap had expired should not insulate Aguilar from his attempt to frustrate the surveillance effort, particularly where, as here, subsequent wiretaps were in place such that he accomplished his objective
 
 
 [5]
 We fail to see the significance of the fact that Congress chose to forbid attempted disclosures in the same statute in which it forbade disclosure. See post at 636 (Hug, J., dissenting). We also note that "erroneous belief" as to the existence of a wiretap only permits a conviction under section 2232(c) when accompanied by the specific intent to impede an interception. See 18 U.S.C. § 2232(c). This "guilty belief" is equivalent to "knowledge" in the sense of subjective certainty; it may be objectively incorrect, but it is nonetheless culpable when coupled with the proscribed conduct of disclosure
 
 
 [6]
 "(7) Requirement of Knowledge Satisfied by Knowledge of High Probability. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes it does not exist." Model Penal Code § 2.02(7) (Proposed Official Draft 1962)
 
 
 [7]
 A passage in the House Report on the Act states that section 2232(c) requires "that the defendant have knowledge that the federal law enforcement or investigative officer has been authorized to or has applied for an interception order." H.R.Rep. No. 647, 99th Cong., 2d Sess. 1, 60 (1986). The word "knowledge" is footnoted "[s]ee House Report 96-1396, Criminal Code Revision Act of 1980, at 32-36." Id. at 60 n. 91. The cited pages describe the mens rea requirements of the Model Penal Code, which were to have been adopted as part of the 1980 reform proposal. See H.R.Rep. No. 1396, 96th Cong., 2d Sess. 1, 32-36 (1980). The Report does not resolve the question at issue here--whether Congress believed that definition should apply in cases where "deliberate ignorance" is not an issue. See id. at 35-36
 
 
 [8]
 Even the dissent recognizes that the knowledge instruction imposed a subjective standard. See post at 634-35 (Hug, J., dissenting)
 
 
 [9]
 It seems to be the typical practice of judges on this circuit not to give any definition of "knowledge." The Ninth Circuit Model Jury Instructions do not include an instruction defining knowledge. And we have previously held that it is not error for a court not to define "knowingly." "The word is a common word which an average juror can understand and which the average juror could have applied to the facts of this case without difficulty." United States v. Chambers, 918 F.2d 1455, 1460 (9th Cir.1990). As I have already indicated, I believe the average juror's understanding of "knowledge" comports with the instruction given in this case
 
 
 [10]
 The dissent finds a serious factual question as to what Aguilar knew and what he merely suspected. Post at 635. It is impossible for a jury to know the strength of certainty with which a belief is held, which may run the continuum from doubt to suspicion to belief to certainty, except by what is manifested objectively. I do not believe the jury was required to disbelieve what Aguilar said he knew and find that he could not actually have known it. Judge Aguilar's contention that Aguilar could not have known a fact that did not exist, see post at 635-36, suggests that his concern is not with the knowledge instruction; rather, it is with the notion that Aguilar's crime is a factual impossibility. When disclosure of actual surveillance efforts occurs, the specific intent to frustrate surveillance efforts exists, and there is subjective belief in the existence of attendant circumstances that makes the conduct and intent criminal, any error as to that belief does not relieve the act of its culpability. Thus the drug dealer who sells soap powder mistakenly "knowing" it to be heroin is guilty. See Quijada, 588 F.2d at 1255 (citing United States v. Roman, 356 F.Supp. 434, 438 (S.D.N.Y.), aff'd, 484 F.2d 1271 (2d Cir.1973), cert. denied, 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974))
 
 
 [11]
 Whoever ... corruptly or by threats or force, or by any threatening letter or communication ... endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both
 18 U.S.C. § 1503 (1988).
 
 
 [12]
 Where most defendant characteristics are deemed "not ordinarily relevant," socio-economic status is flatly "not relevant." Thus, although some offender characteristics may be taken into account where not adequately considered by the Guidelines, socio-economic status is not one of these. The plurality's suggestion to the contrary is troubling. See post at 627 n. 2. To the extent that United States v. Valdez-Gonzalez, 957 F.2d 643 (9th Cir.1992), stands for the proposition that a court may consider socio-economic "factors," as opposed to "status," it should be noted that (1) the "factors" considered therein were "the socioeconomics and the internal politics of the drug trade along the Mexican border," 957 F.2d at 649, not factors unique to the defendants' personal situations; (2) the court looked to socio-economic factors not as a basis for departure, but in evaluating an otherwise permissible factor (role in the offense); and (3) the departures were at least consistent with the Guidelines, paralleling downward adjustments the defendants would have received under section 3B1.2 had the other participants in their crimes been indicted. See 957 F.2d at 648. Valdez-Gonzalez is surely no support for the result in this case
 
 
 [13]
 Nor can I accept the plurality's implication that Judge Aguilar's suffering is rendered unique by his status as an "Article III" judge. Whether Aguilar is a federal, state, municipal, or traffic court judge is irrelevant and does not render his circumstances "atypical."
 
 
 [14]
 The plurality characterizes this as "extra punishment," post at 644, and perhaps rightfully so. But it is a far cry from solitary confinement in prison, the only instance of extra punishment held to warrant downward departure. See United States v. Lara, 905 F.2d 599 (2d Cir.1990)
 
 
 [15]
 Even if I were to conclude that it were permissible for the court to depart, I doubt that a six level downward departure was justifiable. A district court must consider the validity of each level of departure. See Lira-Barraza, 941 F.2d at 748. The court must also provide a statement explaining and justifying the departure. See id. at 751. The district court jumped six levels without explanation. It is difficult to imagine how such an extensive departure could be justified by reference to the structure of the Guidelines
 
 
 [16]
 I do not find it troubling that a more severe sentence should be imposed on remand despite the reversal of one count of conviction. This results from the district court's failure to comply with the Guidelines in the first instance
 
 
 [1]
 Because I am convinced that the convictions on both counts should be reversed, I conclude that there should be no sentence at all. However, the combined opinions of Judge Hall and Judge O'Scannlain affirm the conviction on Count Six. I am thus required to rule on the sentencing issue. I concur in Part II of Judge O'Scannlain's opinion
 
 
 [2]
 When the three separate opinions of this panel are combined, it develops that the conviction on Count Eight for obstruction of justice is reversed, and the conviction on Count Six for wiretap disclosure is affirmed. Although Judge O'Scannlain and I conclude that the knowledge instruction incorrectly stated the law, Judge Hall and Judge O'Scannlain conclude that the error is harmless beyond a reasonable doubt. The conviction on Count Six, therefore, hangs on the harmless error determination, which I discuss in Part II D
 
 
 [3]
 Section 472 of Title 18 provides a fitting analogy. Section 472 punishes a person who "passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell" counterfeited obligations or securities. 18 U.S.C. § 472 (1988) (emphasis added). To be convicted of passing counterfeit money, the defendant must know that the money is counterfeit. United States v. Palacios, 835 F.2d 230, 232 (9th Cir.1987). In addition, to be convicted of attempting to pass a counterfeit bill, the defendant must know that the bill is counterfeit. See United States v. Lacey, 459 F.2d 86, 88-89 (2d Cir.1972). Thus, the attempt language in section 472 does not eliminate the knowledge element of the crime
 
 
 [4]
 This definition comports with the definition of knowledge contained in Model Penal Code § 2.02(2)(b), which is discussed below
 
 
 [5]
 Section 176a provided in part:
 Whenever on trial for a violation of this subsection, the defendant is shown to have or to have had the marihuana in his possession, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains his possession to the satisfaction of the jury.
 21 U.S.C. § 176a.
 
 
 [6]
 Section 174 provided in part:
 Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.
 21 U.S.C. § 174.
 
 
 [7]
 The Tenth Circuit was recently faced with a case in which a defendant had been charged with violating 18 U.S.C. § 1001 and § 1503 for making false statements to FBI agents who were investigating on behalf of a sitting grand jury. The district court had dismissed the obstruction of justice charge for failure to adequately state a crime under 18 U.S.C. § 1503. United States v. Wood, 958 F.2d 963, 964-65 (10th Cir.), amended on other grounds, 1992 WL 58305 (March 19, 1992)
 The specific issue of whether this was a proper charge under section 1503 was not raised in the appeal. The court expressed no opinion on whether the conduct charged was proscribed by section 1503. However, the court expressed some skepticism that it was, noting that obstruction of justice could be committed in a variety of ways but that "we have not found one reported case where a person was charged with, much less convicted of, obstructing justice based on unsworn false statements to FBI agents investigating on behalf of a grand jury." Id. at 974-75 and n. 19.
 
 
 [8]
 § 1503. INFLUENCING OR INJURING OFFICER, JUROR OR WITNESS GENERALLY
 Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 
 
 [62]
 Stat. 769 (1948)
 
 
 [9]
 The Second Circuit in United States v. Masterpol, 940 F.2d 760, 763 (2d Cir.1991), observed that the 1988 amendments "diminished significantly" the force of the Lester precedent. Perhaps, more fundamentally, it could be stated that the problem we saw in Lester was alleviated by Congress
 
 
 [1]
 The district court increased the offense level for Count Six from 12 to 14 for abuse of public trust under U.S.S.G. § 3B1.3. Judge Aguilar was convicted of multiple counts. Therefore, in calculating the combined offense level under U.S.S.G. § 3D1.4, the district court added two levels, resulting in a combined offense level of 16. Because we vacate one count of conviction, § 3D1.4 no longer applies. The maximum offense level applicable is 14, rather than 16
 
 
 [2]
 Although Judge Aguilar's job may constitute one component of his socioeconomic status, see Lopez, 938 F.2d at 1297, unlike Judge Hall, we are not convinced that one component of his socioeconomic status, his job, defines his socioeconomic status. See Judge Hall's Opinion, at 624
 We note in passing that, although the Guidelines specifically state that "socioeconomic status" is not a relevant factor in sentence determination, U.S.S.G. § 5H1.10, this court has recently suggested that consideration of socioeconomic "factors" may not always be precluded. United States v. Valdez-Gonzalez, 957 F.2d 643, 649 n. 3 (9th Cir.1992).
 
 
 [3]
 The extra punishment identified by the district court can be distinguished from other collateral effects arising from conviction. For example, our court has held that the likelihood of deportation is not a valid basis for departure. United States v. Alvarez-Cardenas, 902 F.2d 734, 737 (9th Cir.1990); United States v. Ceja-Hernandez, 895 F.2d 544 (9th Cir.1990). These deportation cases, however, are distinguishable in two respects. First, despite its undeniable impact, deportation is not considered punitive. See Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954). Second, Alvarez-Cardenas involved a drug conviction, and Ceja-Hernandez a conviction for illegal presence in the United States. Deportation as a consequence of the former is not rare, and as a consequence of the latter is the rule. We must therefore assume that the Sentencing Commission took the possibility of deportation into account when determining the appropriate offense level for these crimes. See Ceja-Hernandez, 895 F.2d at 545
 
 
 [4]
 The right to receive, beginning at age sixty-five, the salary of the office (presently $133,600 per annum) for life, can be calculated from actuarial tables; the value of such annuity is likely to exceed $1.3 million dollars. See 28 U.S.C. § 371(a); cf. 5 U.S.C. § 8339
 
 
 [5]
 Similarly, a forfeiture proceeding following a drug or racketeering conviction, or a civil damage award after a conviction for a white collar crime, simply is not "atypical." We cannot presume the Sentencing Commission did not anticipate these common collateral effects of conviction for such crimes when designing the Guidelines
 
 
 [6]
 See Nixon v. United States, 938 F.2d 239, 248, 250 (D.C.Cir.1991) (Edwards, J., dissenting in part and concurring in judgment) (noting the recent impeachments of Harry E. Claiborne and Alcee Hastings, as well as Walter Nixon), aff'd, --- U.S. ----, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993); see also United States v. Claiborne, 765 F.2d 784 (9th Cir.1985), cert. denied, 475 U.S. 1120, 106 S.Ct. 1636, 90 L.Ed.2d 182 (1986); United States v. Nixon, 816 F.2d 1022 (5th Cir.), reh'g denied, 827 F.2d 1019 (5th Cir.1987), cert. denied, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988); and United States v. Collins, 972 F.2d 1385 (5th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993)